**NORTHERN HELEX COMPANY**

v.

**The UNITED STATES.**

No. 454–70.

United States Court of Claims.

Jan. 21, 1972.

Clarence T. Kipps, Jr., Washington, D. C., atty. of record, for plaintiff; David W. Richmond, John L. Rice, Miller & Chevalier, Washington, D. C., F. V. Roach, Ralph P. Blodgett, Jim W. Krueger, Omaha, Neb., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, Judge, DURFEE, Senior Judge, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is the preliminary round in an effort by the Northern Helex Company to recover $83,632,368 allegedly due it as a result of an admitted breach by the Government of a contract to purchase helium. On cross motions for summary judgment, we decide the issues of materiality of the defendant's breach and of claimed waiver by the plaintiff of that default. Only those threshold issues of liability are disposed of today; the critical questions of the validity of the subsequent termination of the contract by the Government and of the recovery of damages by the plaintiff are not before us in any way.

The plaintiff, a wholly owned subsidiary of Northern Natural Gas Company, made a contract with the United States, acting through the Department of Interior, on August 15, 1961. This agreement was authorized by the Helium Act Amendments of 1960 (50 U.S.C. § 167, et seq.), a long-range program designed to conserve helium as a natural resource for future use. A by-product of the production of natural gas, helium was wasted daily as it escaped into the atmosphere at such a rate that the helium-bearing gas resources in the southwestern states were expected to be inadequate for national needs by 1980–1985. Because of the unique properties of helium and the slim likelihood of finding new sources as rich as the Hugoton Area, involved here, the helium conservation program was initiated. One of its components was plaintiff's contract.

This provided for the purchase by the United States of the helium to be produced by Northern Helex which was estimated to be 13.5 billion cubic feet over a span of years. The helium was to be extracted from Hugoton gas, delivered, and paid for each month over the 22-year contract period with an annual fiscal year limitation of $9.5 million. The unit price of $11.24 per thousand cubic feet had increased to $12.41 by the date this action was filed (in December 1970) due to automatic price adjustments envisaged by the agreement. The Government also entered into similar contracts with Cities Service Helex, National Helium Corporation and Phillips Petroleum Company. Pursuant to its contract, Northern Helex constructed facilities, extracted, and delivered helium from December 7, 1962, onward.

The helium conservation program was intended to be self-liquidating, financed with borrowing authority provided by Congress and with funds lent by the Treasury Department to Interior. The borrowed funds were to be supplemented and, within 25 to 35 years, repaid with interest from helium sales proceeds. Interior was to sell some of the helium at a price high enough to pay for the entire program and still have 40–50 billion cubic feet in storage for use after 1983. The "federal market"—consisting of Government agencies, their prime contractors and subcontractors—was expected to purchase its major helium requirements from Interior and provide the basic financing for the whole program.

Unfortunately this forecast did not prove itself. The difficulty was that, from the mid-1960's, private helium plants began to operate outside the program and to sell to government contractors. Also, other conservation contrac-

tors produced helium in excess of the amount which could be sold to Interior under their contracts and sold the excess in competition with Interior at lower prices. Northern Helex sold helium only to Interior, but over the period of 1965–1969, some $25 million (it is said) was lost to the program because helium was purchased for federal use from other private producers rather than the Bureau of Mines. Congress did not appropriate enough funds to satisfy the payments due under the agreements of Northern Helex and its companions in the program. By letter dated November 26, 1968, Interior informed plaintiff that the Government would be unable to make payments when they became due as of January 1969. Beginning in December 1968, and continuing through 1969 the Government failed to pay the complete amount owed. Arrearages in the monthly payments ranged from a low of $664,-122 to a high of $3,235,349. For deliveries from November 1969 through November 1970, the Government paid nothing at all.

In May 1970, the Interior Department convened a meeting of the four conservation contractors in which they were told that the unit price and the maximum annual payment would have to be negotiated downward. A letter of June 24, 1970 (acknowledged June 26), from Northern Helex notified the Government that its failure to make payments was a material breach which was not being waived, but that Northern Helex was willing to discuss modifications. A draft agreement which would have increased the obligations of plaintiff while the payments to it were decreased was circulated along the lines discussed in the negotiations. Meanwhile, in his request for supplemental appropriations for fiscal year 1971, the President asked only $56,-100,000 in borrowing authority for obligations under the helium contracts. This amount was not sufficient to pay outstanding debts and all anticipated deliveries for the remainder of the fiscal year but only to cover five months of opera-tion at the present contract price and seven months at the reduced price proposed by Interior. No real progress was made during the negotiations, as Northern Helex delivered 657,008,000 cubic feet of helium from November. 1, 1969, through November 30, 1970, plus an additional 44,647,000 through December 24, 1970, the date of filing of the petition in this court, without receiving any payment.

In its petition, plaintiff alleged that although its contractual obligation to perform had been discharged by the Government's material breaches of contract, it would continue to tender helium to the Government in mitigation of damages and in the interest of conservation. This was done, according to Northern Helex, because helium extraction facilities have been interrelated with its liquefied petroleum gas and petrochemical operations in such a way that the helium facilities must be continued in operation whether helium is wasted or stored. Northern Helex has no facilities for storage, purification, distribution, or marketing of helium and there is so little demand for the gas in the private market that the company has not considered it financially feasible to develop such facilities. On December 30, 1970, Northern Helex notified Interior of this suit and of its decision to continue to deliver helium, despite the material breach, because of the integration of its facilities and the need to save helium.

On January 14, 1971, the United States sent Northern Helex a check for $8,671,-631.99—the total amount then due for all helium delivered by plaintiff—which the company cashed, without any notation on the check, and it then amended its petition to reflect payment as a reduction of damages. On January 26, 1971, the Under Secretary of Interior wrote plaintiff terminating the contract under its termination clause, effective March 28, 1971. Plaintiff does not acknowledge the legitimacy of this asserted termination. Since then, a "no prejudice agreement" has been entered into under which In-

terior agrees to store helium which Northern Helex has continued to deliver. Payment also continued. Northern Helex billed Interior for helium delivered through March 31, 1971. The bills carry a legend indicating that delivery, submission of documents, and payment shall be without prejudice to the rights of the parties. After the recent Congressional appropriation of funds, on June 23, 1971 Northern Helex received a check of $2,-285,872.87 for the period of December 1970 through March 28, 1971. This June payment is also considered by Northern Helex to be a reduction of damages without prejudice to its rights.

## I. *The materiality of the breach*

The Government's failure to pay a large amount over an extended period of time was a conceded breach of its contractual obligation. Arrearages in monthly payments which began in December, 1968 and continued through 1969 ranged from $664,122 to $3,235,349. For deliveries from November 1, 1969 through November 30, 1970, the Government paid nothing at all. By the time suit was filed in December 1970, $8,671,-632 was owing to the plaintiff.[1] The failure of the Government to pay required Northern Helex to borrow funds to continue performance. These loans which were zero at the beginning of 1969 increased steadily to $7,175,000 by December 31, 1970. Northern Helex claims it was thus damaged at the rate of $56,-000 a month (the interest rate of 8% times $8,600,000).[2] Unlike Interior's contracts with the three other conservation producers of helium, plaintiff's arrangement did not provide for payment of interest by defendant on amounts due but unpaid.

■ The Government contends, however, that such delinquency without more does not constitute a total breach warranting the contractor in ending the agreement. Perhaps mere delay in payment, for a while, would not be a material breach but there is a clear distinction between delay of that kind and a total failure to pay over many months. Our jurisprudence strongly suggests that the latter sort of breach by the Government is material, just as it would be in the case of a private party. Ferris v. United States, 27 Ct.Cl. 542, 546 (1892); Pigeon v. United States, 27 Ct.Cl. 167 (1892); Overstreet v. United States, 55 Ct.Cl. 154, 172 (1920); Suburban Contracting Co. v. United States, 76 Ct.Cl. 533, 542–43 (1932); Whitbeck, Receiver v. United States, 77 Ct.Cl. 309, 335, cert. denied, 290 U.S. 671, 54 S.Ct. 90, 78 L.Ed. 579 (1933); Joplin v. United States, 89 Ct.Cl. 345, 363 (1939); Brooklyn & Queens Screen Mfg. Co. v. United States, 97 Ct. Cl. 532 (1942); Seatrain Lines, Inc. v. United States, 99 Ct.Cl. 272, 316 (1943). Nothing in the contract excused or palliated defendant's default. The "Force Majeure" clause (Art. XVI), dealing with inability of a party to carry out its obligations because of force majeure, specifically excepted the obligation to make payments from the leniency allowed by that provision. Nor was this a contract in which the Government's duty to pay was conditioned on receipt of appropriations or approval by Congress. *Cf.* Congress Constr. Corp. v. United States, 161 Ct.Cl. 50, 314 F.2d 527, cert. denied, 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52 (1963). We have, in short, not the slightest doubt that the prolonged failure to pay large amounts was a material breach of the contract.[3]

---

1. More precisely, $8,119,859 was due for 612,546,000 cubic feet of helium delivered through October, 1970. The remaining $551,773 was claimed by plaintiff as payment for the November delivery of 44,462,-000 cubic feet, but that sum was not due until December 29, five days after suit was filed.

2. Whether or not these figures are slightly inflated, as Government counsel suggested in the reply brief and at oral argument, is a consideration which may be relevant to a trial on damages but not to our determination of liability.

3. Intermixing the separate issue of waiver with that of the materiality of the breach, defendant relies on Pasquel v. Owen, 186 F.2d 263 (C.A.8, 1950); Willard Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923);

## II. *Waiver before suit*

The Government's primary defense is that, assuming Northern Helex could have elected to claim total breach, it waived that right by continuing performance and by treating the lack of payment as immaterial.

 There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse (Williston, Contracts, 3rd ed., Vol. 5, § 688). But it is very doubtful that, even when first formulated, that rule disregarded particular circumstances justifying further performance in the specific case. As a general proposition, one side cannot continue after a material breach by the other (such as failure to pay), act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court. In this case, however, we have a special set of qualifying facts. Plaintiff's helium extraction facilities are so interrelated with its liquefied petroleum gas and petrochemical operations that the helium facilities must be continued in operation whether helium is wasted or sold. There was, moreover, no other market for the helium Northern Helex was producing. Any one of the four conservation contractors generated enough to satisfy the current demand. Northern Helex alone among those companies had no purification and liquefication operations. Nor had it developed marketing or storage facilities, since it anticipated selling only to the Government and, as a result of the lack of demand in the private sector at the end of the 60's, it did not appear economically feasible to make such an investment. The sum of it is that Northern Helex continued to tender helium to the Government because it had no other outlet or alternative use for the gas.

In addition, and this is another special aspect of the case before us, the action taken by Northern Helex was consistent with the purpose of the program, the conservation of a valuable national resource. In considering the Government's failure to observe the procedural requirements of the National Environmental Policy Act of 1969 when it terminated the contracts of the three other suppliers,[4] the Tenth Circuit characterized the termination as "an action which has environmental consequences, namely rapid depletion of the helium resources of the country." National Helium Corp v. Morton, C.A. 10, 455 F.2d 650 (decided Oct. 4, 1971). The decision, requiring that the Secretary at least consider the environmental impact of his action, is predicated on the view expressed by Congress "that it is in the national interest to foster * * * the development and distribution of supplies of helium * * * sufficient to provide for essential Government activities." Helium Act, 50 U.S.C. § 167m.

These are good reasons vindicating plaintiff's decision to continue performance, but defendant intimates that, in truth, Northern Helex did not actually act upon these considerations but, rather, treated non-payment as immaterial for many months, and then brought suit at the last minute, only when it thought that full payment was imminent and the contract was about to be ended by the Government under the termination provi-

---

Farr v. Hain S.S., 121 F.2d 940 (C.A. 2, 1945); and Blair v. United States, 147 F.2d 840 (C.A. 8, 1941). In none of these cases was there the question of the materiality of a gross failure to pay. *Farr* and *Blair* stand for the proposition that where one of the parties decides to continue performance after a default which was not material it can still sue for damages, but even that fact-pattern is not present here.

4. Unlike plaintiff, those three companies did not file suit here and did not treat their contracts as discharged by the failure to pay. After the Interior Department terminated their agreements in January 1971 (as it did plaintiff's), they sued in a district court to enjoin the termination. The Tenth Circuit upheld the injunction on the ground that Interior had failed to comply with the conditions of the Environmental Policy Act before it ended performance.

sion. On the record before us, we are not impressed with this suggestion, which defendant supports by little more than suspicion. As early as June 24, 1970, plaintiff sent a letter to the appropriate government official which explicitly said: "The failure of the Government to make payments due under the contract constitutes a material breach." Moreover, full payment was not assured when plaintiff brought suit in December 1970. A supplemental appropriation bill was going through Congress, but the legislative history reveals that, following critical reports by the General Accounting Office and loss of much of the federal market for helium, the conservation program lacked Congressional support at that time. The debate on the floor of the House of Representatives indicates that the Executive did not seek full and adequate funding in order to give Interior leverage to negotiate a reduced contract price: "To pay it [the amount owing] now will take their feet from the fire, and if payment is made they will not renegotiate. They can well wait for their money. I would urge that the pressures be kept on and their feet be kept to the fire * * *" (Cong.Rec. Dec. 10, 1970, p. H11501, Cong.Hosmer.) By the time of suit, the supplemental appropriations bill had reached the conference committee, but there was still no guarantee that the bill would be enacted, and even if it were that Interior would pay Helex, rather than other companies with contracts under which interest could be collected. The amount appropriated was insufficient for all the outstanding debts under all the contracts and at the same time to continue payments for the remainder of the fiscal year; as we have said, it was only enough to make the reduced payments under the contract modifications proposed by Interior which the companies had not yet accepted. Senate Hearings on H.R. 199281, Committee on Appropriations, 91st Cong., 2d Sess. p. 213.

We accept, then, as valid the reasons plaintiff gives for continuing performance despite the Government's material breach. These grounds sustain applica-

tion here of the rule set forth in Section 1–207 of the Uniform Commercial Code:

> A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest" or the like are sufficient.

Plaintiff's continued performance was founded on the required reservation. In its letter of June 24th, it wrote Interior that the failure of the Government to make payment "is a material default under the contract. We wish to reiterate that any performance rendered by Northern Helex Company subsequent to any such defaults has been and shall be with the express understanding that such action shall not constitute a waiver of any of Northern Helex Company's rights and remedies." On the same day, the company sent another letter, also stating that the Government's failure to pay constituted a material breach (item 3); that any negotiations undertaken with Interior were voluntary (items 6–8); and that such discussions "shall not constitute a waiver by Northern Helex of any of its rights or powers, whether existing by virtue of contract or not" (item 9). On June 26th, the Acting Chief of the Division of Helium of the Bureau of Mines acknowledged receipt of both letters.

The Code's official comment explains that Section 1–207 adds no new requirement of language of reservation not already required "but merely provides a specific measure on which a party can rely as he makes or concurs in any interim adjustment in the course of performance." U.C.C. § 1–207 (comment 2). The defendant seizes upon language elsewhere in the comment that the provision applies not to the creation or loss of remedies in the ordinary course of performance "but rather to a method of procedure where one party is claiming as of right something which the other feels to be unwarranted." In this instance, plaintiff's reservation amounted to a method of procedure under which it

would continue to perform. The section is not being invoked to create a remedy because a remedy for the seller, when the buyer breaches, already exists under the law (U.C.C. §§ 2–703, 2–704); plaintiff merely sought to preserve that relief by its explicit notification.

One remedy under the Code (§§ 2–703, 2–704), when the buyer's failure to pay amounts to a breach of the whole contract, empowers the wronged seller who has unidentified and unfinished goods in his possession, "in the exercise of reasonable commercial judgment for the purposes of avoiding loss and of effective realization either [to] complete the manufacture and wholly identify the goods to the contract or [to] cease manufacture and resell for scrap or salvage value or [to] proceed in any other reasonable manner." The official comment to § 2–703 says that the article "rejects any doctrine of election of remedy as a fundamental policy", and the comment to § 2–704 explains that "the seller is given express power to complete manufacture or procurement of the goods for the contract unless the exercise of reasonable commercial judgment as to the facts as they appear at the time he learns of the breach makes it clear that such action will result in a material increase in damages." The comment also puts the burden on the buyer to show the commercially unreasonable nature of the seller's action in completing manufacture.

It is plain from these provisions that, to determine whether waiver has occurred, a more complex inquiry must be made than merely, "did performance continue?" The guiding principle is whether, in the individual circumstances, the seller exercised "reasonable commercial judgment" in continuing to manufacture and deliver, in the effort to mitigate damages, although his obligation to perform had been discharged by the buyer's total breach. See Hawkland, A Transactional Guide to the Uniform Commercial Code, Vol. 1, p. 280 (1964). What we have already said shows that, in our judgment, plaintiff was fully warranted in following the course it chose. It exercised "reasonable commercial judgment" in deciding to continue performance.

■ Under the traditional view, the innocent but aggrieved party may continue performance if he asserts that right, and also if assent is given by the other side. Williston, Contracts, *supra*, sec. 688; Pasquel v. Owen, 186 F.2d 263, 271 (C.A.8, 1950). We reject the contractor's point that in fact defendant consented to continued performance,[5] but adhere to the more modern position of the Uniform Commercial Code, in its Section 1–207, that the opponent's assent is not a prerequisite.[6] "As always, the federal contract law we apply should take account of the best in modern decision and discussion." Padbloc Co. v. United States, 161 Ct.Cl. 369, 377 (1963). This court has explicitly recognized the authority and relevance of the Uniform Commercial Code in the field of public contracts, Everett Plywood & Door Corp. v. United States, 190 Ct.Cl. 80, 89, 419 F.2d 425, 430 (1969), as has the Second Circuit, United States v. Wegematic Corp., 360 F.2d 674, 676 (C.A.2, 1966) (Friendly, J.). See, also, Harry Thuresson, Inc. v. United States, Ct.Cl. 453 F.2d 1278, decided this day.

We are convinced of the fairness of following the modern U.C.C. rule in this case because of the harshness of a contrary result on our special facts, where cessation of production was commercially impossible and avoidance of waste most desirable. As Williston explains the rationale behind the strict doctrine of elec-

---

5. Plaintiff relies on the Government's response to the Northern Helex letters on June 24th characterizing the non-payment as a material breach and stating that further performance would not be a waiver of that breach. In its entirety, this response was: "On behalf of Assistant Secretary Dole, thank you for the two let-

ters you handed me on June 25. We appreciate having them." It is hard to divine assent in this routine acknowledgment.

6. Changes in the New York Law of Damages, 31 Fordham L.Rev. 749, 752 (1963).

tion of remedies (Williston, Contracts, *supra,* sec. 684), that theory has little impact here. He says: "The law simply does not, under the circumstances, permit a party to exercise two alternative or inconsistent rights or remedies." In this instance, continued delivery was not an inconsistent, voluntarily chosen, course of action, but an indispensable route which was the only practicable one. The Government was not hurt and it did not change its position. It was certainly not misled into thinking that payment was immaterial to Northern Helex and that the latter would continue to perform regardless.[7] Nor did the Government count on the uninterrupted tender of helium; indeed, it terminated the contract a few months later. Similarly, there is no basis for believing that the defendant reasonably thought that the contractor had waived or abandoned its position that the breach was material and total.[8]

▪ The parties' own agreement bolsters the conclusion that plaintiff could continue to deliver without waiving the Government's breach. Article XVII provided: "No waiver by either party for any one or more defaults by the other in the performance of any provisions of this contract shall operate or be construed as a waiver of any future default or defaults, whether of a like or of a different character." This indicates that even an express waiver would be limited, and would operate only as to the particular defaults mentioned. Each successive non-payment would continue to be a breach. With this provision in the contract it is very hard to infer a continuing waiver by Northern Helex as the Government's debt to it waxed greater by the month; the opposite inference is the more reasonable. The same clause

scotches any suggestion that plaintiff owed the defendant a warning before deciding to bring suit. Notice that nonpayment was a material breach had already been given, and that was enough.

### III. *Waiver after suit*

▪ The Government urges as another instance of waiver continued performance by Northern Helex after filing suit. Not only did the plaintiff tender helium, but it corrected errors in measurement and determined the exact volume of the helium-gas mixture. Such adherence to the letter of the contract does not, however, undercut plaintiff's position; on the contrary, the performance which continued and which required formation of a storage contract with the Government lends support to the contractor's assertions of inability to stop production, of lack of facilities to store helium, and of the absence of alternative means of disposal. Those circumstances were all indicated above as the reasons why, in this case, continuation of performance reasonably served to mitigate damages. Moreover, accurate record-keeping and measuring was essential to the identification of helium with the contract pursuant to U.C.C. § 2–704(2), one remedy afforded Northern Helex by the Code.

The Government points, too, to the cashing of the check sent by the defendant on January 14, 1971 to cover all money then owing, as mooting or waiving the cause of action. Neither of the cases it cites (Routed Thru-Pac, Inc. v. United States, 185 Ct.Cl. 428, 440, 401 F.2d 789, 796 (1968), and Early & Daniel Co. v. United States, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926)), is pertinent. In *Routed Thru-Pac,* the entire amount of the defendant's counterclaim was tendered by the plaintiff; the check

---

7. This case is therefore different from De-Vito v. United States, 188 Ct.Cl. 979, 413 F.2d 1147 (1969), in which there was no reservation of rights and the contractor continued to work in reliance on the Government's failure to terminate.

8. Even under the conventional view that assent is necessary, it is held that a party deciding to proceed with performance after breach may still change his mind if the other party has not changed his position in reliance. Western Transmission Corp. v. Colorado Mainline, Inc., 376 F.2d 470, 472 (C.A. 10, 1967).

was then accepted and deposited. In our case, there was no payment in full of the entire amount claimed as a result of total breach, about ninety million dollars. In *Early & Daniel Company*, the two parties disputed the Government's call for more hay than the contract required; following delivery under protest, plaintiff accepted the Government's tender of the contract price and was thereby held to have waived its right to a higher price. That case likewise differs in that the total contract price was paid to the contractor and accepted by him; here, we have only partial payment, expressly accepted by way of mitigation of damages.

 We find more persuasive the decisions indicating that, where the Government knows of the contractor's intention not to relinquish his right to full payment, the acceptance of partial payment, even without notation on the check, does not waive his claim. In one case, although the contractor had signed a voucher which stated that payment represents "complete and final settlement," there was no waiver because there were timely protests. Inland Trucking Corp. v. United States, 150 Ct.Cl. 642, 281 F.2d 457 (1960). We have held, too, that when a certain sum is due acceptance of part payment will not deprive the claimant of his right to sue unless acceptance of the lesser sum was by way of accord and satisfaction. Finney v. United States, 32 Ct.Cl. 546 (1897). Even where the Comptroller General notified a claimant that he should not accept payment of the amount allowed if he desired review of the settlement, the plaintiff could sue for the balance alleged to be due because he advised the Government that he accepted the sum tendered as part payment only, and reserved the right to litigate for the remainder. Benedict v. United States, 66 Ct.Cl. 437 (1928). Waiver of delay damages was held not appropriate where acceptance of late payments was not the cause of continued

tardiness by the defendant in making payments. Sanborn v. United States, 46 Ct.Cl. 254 (1911). These cases show that a critical factor in the court's refusal to find estoppel is the reservation of rights, express or implied. See Luria Brothers & Co. v. United States, 177 Ct. Cl. 676, 369 F.2d 701 (1966).

 Here, the Government makes no argument that it was misled by the cashing of the check or ignorant of plaintiff's vigorous prosecution of this suit. Indeed, after the filing of suit on December 24, 1970 every billing statement (except for one inadvertent omission over a one-week period) contained the legend: "Delivery of helium, submission of these documents, and payment shall be without prejudice to the rights and obligations of the parties." After the large payment on January 22, 1971, Northern Helex amended its petition to reflect its receipt of the Government's check. Again, on June 10, 1971 plaintiff wrote that it would consider further payments "as a reduction of damages and to be without prejudice to the rights of the parties in the pending Court of Claims case." Accordingly, another check for $2,285,-872.87 was received on June 23rd and accepted. The whole pattern of plaintiff's conduct demonstrates that it has consistently continued to reserve its rights. We think it had the privilege to accept payment with such reservations, especially since interest could not be collected for further delay. There has therefore been no waiver of defendant's breach. See Anderson, Uniform Commercial Code, p. 285, § 2–612:16 (1971).

### IV. *Conclusion*

For these reasons, we hold that the Government's breach (through non-payment) was material and total, justifying the contractor in considering the contract at an end, and that Northern Helex has not waived that breach.[9] We stress, however, at the end of this opinion as we did

9. As a result of our finding of material breach due to nonpayment, we need not, and do not, pass on the two other grounds put forward by the plaintiff in its petition:—breach by anticipatory repudiation and breach of the implied obligation to preserve the federal market.

at the outset, that we in no way pass upon plaintiff's claim to damages, full or partial, for this breach. This reservation includes the question, among others, whether the Government's termination of the contract in January 1971 would have been valid under the termination provision if the contract had remained in effect. All those issues relating to damages are not before us and we leave them entirely open, without intimating any opinion or tendency. Whether plaintiff's present victory will be real or Pyrrhic still remains to be litigated.

The plaintiff's motion for summary judgment is granted and the defendant's is denied. The amount of recovery, if any, will be determined in further proceedings under Rule 131(c).