RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0266P (6th Cir.)
File Name: 03a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DIVERSIFIED ENERGY, INC.,
 *Plaintiff-Appellee/*
 *Cross-Appellant,*

 *v.*

 Nos. 01-6043/6100

TENNESSEE VALLEY
AUTHORITY,
 *Defendant-Appellant/*
 *Cross-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 97-00223—Thomas G. Hull, District Judge.

Argued: March 13, 2003

Decided and Filed: August 1, 2003

Before: CLAY and ROGERS, Circuit Judges; COFFMAN,
District Judge.[*]

─────────────

[*] The Honorable Jennifer B. Coffman, United States District Judge for
the Eastern and Western Districts of Kentucky, sitting by designation.

─────────────

## COUNSEL

**ARGUED:**  Peter K. Shea, TENNESSEE VALLEY
AUTHORITY, Knoxville, Tennessee, for Appellant. Herbert
S. Sanger, Jr., WAGNER, MYERS & SANGER, Knoxville,
Tennessee, for Appellee. **ON BRIEF:** Peter K. Shea, Edwin
W. Small, TENNESSEE VALLEY AUTHORITY,
Knoxville, Tennessee, for Appellant.  Herbert S. Sanger, Jr.,
WAGNER, MYERS & SANGER, Knoxville, Tennessee,
Martin B. Bailey, HUNTON & WILLIAMS, Knoxville,
Tennessee, for Appellee.

─────────────

## OPINION

─────────────

COFFMAN, District Judge.  This appeal, involving a
dispute between the Tennessee Valley Authority ("TVA") and
one of its former coal suppliers, raises three questions:
(1) whether the district court erred in determining that it had
subject matter jurisdiction, pursuant to the Contract Disputes
Act of 1978 ("CDA"), 41 U.S.C. § 601 *et seq.*, over the
plaintiff's claim for lost profits; (2) whether the district court
properly concluded, under standard principles of contract law,
that the plaintiff is not entitled to recover damages based on
a contract price/market price differential; and (3) whether the
unappealed February 27, 2001, administrative decisions
which denied the plaintiff's claims for actual damages are
entitled to *res judicata* effect.  For the reasons that follow, we
**AFFIRM** the district court's judgment.

## I.  Factual Background

For a second time, these parties bring their dispute to this Court.[1]   On August 18, 1990, the plaintiff, Diversified Energy, Inc. ("Diversified"), and the defendant, TVA, entered into a long-term coal supply contract (the "Contract") under which Diversified was to provide TVA with 10,000 tons of coal per week through March 27, 1996.  Diversified was authorized to obtain and deliver coal from only one source -- the Sigmon Coal Company ("Sigmon").  In accordance with its agreement with Sigmon, Diversified was to pay Sigmon the full purchase price, less a commission of $.98 per ton. The Contract contained a "reopener" provision which entitled either party to reopen the Contract at its midpoint to negotiate price and other terms.[2]   By letter dated December 14, 1992, TVA invoked that provision but refused to negotiate with Diversified because Diversified had allegedly violated the

---

[1] This is the second appeal of this case; the factual background is more fully summarized in the Court's prior opinion, *Diversified Energy, Inc. v. TVA*, 223 F.3d 328 (6th Cir. 2000) (hereinafter, *"Diversified I"*).

[2] The reopener provision provided:

[T]his contract shall continue through March 27, 1996, unless terminated by agreement or as otherwise negotiated herein. Provided, however, this contract may be reopened by either party three (3) months prior to March 19, 1993 . . . for the purpose of negotiating price and other terms and conditions of the remaining portion of the maximum commitment . . . . If either party exercises this reopener it shall give the other party written notice by December 19, 1992. If the reopener provision has been exercised, this contract will terminate on March 19, 1993, unless TVA and the Contractor [i.e., Diversified] have mutually agreed in writing by March 19, 1993, to continue this contract.  Neither party shall be under any obligation or liability to extend this contract if either party desires to terminate deliveries.

"Officials not to Benefit" provision[3] of the Contract by giving a $10,000 loan, a telephone calling card, and college football tickets to a TVA employee in exchange for confidential information.  Furthermore, by letter dated March 19, 1993, TVA's Vice-President of Fossil Fuels, Gregory Vincent, explained that TVA considered the Contract terminated and that it would not extend the Contract or accept any further deliveries of coal from Diversified.  In response, Diversified exercised its rights to initiate a dispute under the Contract's "Disputes" clause, which made the Contract subject to the CDA and to TVA's implementing regulations.[4]   On May 18, 1993, Diversified submitted a certified breach of contract claim to a Contracting Officer requesting "a determination that [it] is entitled to recover from TVA the amount which [it] would have made from delivery of the remaining portion of the maximum commitment under the Contract."  Diversified specifically claimed in its letter that this amount was $21,980,000, representing the 1,570,000 tons of coal which

---

[3] This "Officials not to Benefit" provision read:

[N]or shall the Contractor offer or give, directly or indirectly, to any officer, employee, special Government employee, or agent of TVA any gift, gratuity, favor, entertainment, loan, or any other thing of monetary value, except as provided in 18 C.F.R. § 1300.735-12 or -34.  Breach of this provision shall constitute a material breach of this contract and TVA shall have the right to exercise all remedies provided in this contract or at law.

[4] Pursuant to the CDA, a contractor and the contracting government agency must submit disputes to a Contracting Officer.  If the parties are unable to resolve their claims by agreement, the Contracting Officer may issue a decision on the dispute.  The terms of the instant Contract, as well as TVA's implementing regulations, have altered this administrative scheme slightly by requiring that any dispute which cannot be settled by the parties shall be decided by a Disputes Contracting Officer, rather than a Contracting Officer.  Under this scheme, a Contracting Officer's role is to receive claims from a contractor and to raise claim on TVA's behalf. A Disputes Contracting Officer's sole function is to decide claims. *See Diversified I*, 223 F.3d at 332.

remained undelivered under the Contract multiplied by $14 per ton -- the amount which Diversified would have been entitled to in liquidated damages if TVA's conduct amounted to a unilateral termination of the Contract.[5]  In a July 11, 1995, letter addressed to TVA's Vice-President of Purchasing, Victor King, the Disputes Contracting Officer who would be deciding its contract claim, Diversified made an alternative claim for damages based on the difference between the contract price and the market price for comparable long-term coal contracts at the time of TVA's March 19, 1993, repudiation letter.  In its letter, Diversified alleged that the contract price exceeded the market price by $5.13 per ton of coal and that, therefore, it was due approximately $8,054,100 in damages.  The Disputes Contracting Officer rejected Diversified's contract claim, as well as its two specific proposed measures of damages, concluding that Diversified had violated the Officials not to Benefit provision and that the TVA had a consequent right to terminate the Contract.

On March 31, 1997, Diversified filed suit in district court, appealing the Disputes Contracting Officer's decisions. Upon Diversified's motion for summary judgment, the trial judge determined that TVA had, through "inept and heavy-handed" behavior, breached the Contract in multiple ways.  The trial court also ruled, however, that TVA's breaches were not tantamount to a unilateral termination of the Contract. Moreover, the trial court determined that Diversified committed prior material breaches of the "Officials not to

---

[5]The Contract contained a "Unilateral Termination Right" provision which entitled TVA to terminate the Contract unilaterally upon 60 days' prior written notice.  The penalty for invoking this clause was $14 per ton of coal multiplied by the remaining number of tons scheduled for delivery from the effective termination date through the earliest applicable date for termination.

Benefit" provision, thereby disqualifying it from any damages.

Diversified appealed the district court's decisions to this Court, arguing that the district court was precluded from considering TVA's defense under the Officials not to Benefit provision because TVA's Contracting Officer had never raised that claim.  Diversified also argued that the district court erred in refusing to construe TVA's conduct as a unilateral termination of the Contract.  This Court affirmed the district court on the unilateral termination issue but reversed with respect to TVA's claim under the "Officials not to Benefit" provision, concluding that the district court lacked jurisdiction over that claim because TVA's Contracting Officer had never raised it.  We held that the district court could assert jurisdiction over TVA's defensive claim only if it had been the subject of a valid, final decision by the contracting agency.  We further held that a valid, final decision on TVA's claim could be made only if it had first been raised by a Contracting Officer.  However, because the March 19, 1993, letter which first raised TVA's "Officials not to Benefit" claim was not written by a Contracting Officer,[6] and because the Disputes Contracting Officer who later raised that claim was not simultaneously acting as the Contracting Officer, we determined that TVA's claim was not properly before the Disputes Contracting Officer.  Accordingly, this Court concluded that the district court had no power to consider TVA's defensive claim and remanded the case to the district court with instructions to award damages to Diversified on its contract claims "in accordance with standard contract law principles." *See Diversified I*, 223 F.3d at 336-38, 340.

---

[6]Vincent -- the author of the March 19, 1993, letter -- was not authorized to act as a Contracting Officer when he alleged that Diversified breached the "Officials not to Benefit" clause.

Upon remand, Diversified first sought an award of actual damages under the contract price-market price differential. TVA, attempting to rely on the Court's reasoning in *Diversified I*, moved to dismiss that claim, arguing that Diversified's initial 1993 claim letter to the Contracting Officer submitted only a claim for liquidated damages. On November 6, 2000, the district court, uncertain whether Diversified's 1993 claim letter was sufficient to state a valid claim for actual, non-liquidated damages, stayed the action for 120 days "to allow for administrative consideration of Diversified's claim for actual damages."

In an August 29, 2000, letter sent to Diversified, TVA's Vice-President of Procurement, Paul R. LaPointe, had advised that Larry A. Mize had been assigned as the new Contracting Officer who would be administering Diversified's contract claims. On November 14, 2000, Mize informed Diversified that TVA would also be asserting a claim that Diversified had breached the "Officials not to Benefit" Clause -- the same claim which we ruled the district court lacked jurisdiction to consider. Mize also asked Diversified to submit any additional materials relevant to its contract claims, indicating that his role was to resolve the matter by agreement. On January 22, 2001, Diversified sent a letter to Mize specifying that it sought actual damages as measured by the difference between the contract price and the market price or, alternatively, the profits it lost due to TVA's repudiation. In two letters dated February 27, 2001, Mize -- now also acting as the Disputes Contracting Officer -- refused to award Diversified either measure of damages, concluding that its prior breach of the "Officials not to Benefit" clause precluded it from recovering any damages.

On March 7, 2001, the district court lifted its stay. On the same day, TVA moved for partial summary judgment on Diversified's claim based on the contract/market price differential, claiming that such an award would not be consistent with standard contract law principles because it

would place Diversified in a better position than it would have enjoyed had the Contract been performed fully. The district court granted TVA's motion, holding that Diversified's damages would be calculated on the basis of the profits it would have made had the Contract been performed. On May 23, 2001, TVA filed objections to the district court's jurisdiction, claiming, among other things, that Diversified needed to amend its complaint to appeal the adverse February 27, 2001, decisions in order for the district court to have jurisdiction over any of its damage claims.

On June 7, 2001, Diversified moved for summary judgment on its lost profits claim. TVA opposed the motion, alleging (1) that the district court lacked jurisdiction over that claim because it had not been submitted to a Contracting Officer before Diversified filed its original complaint and because Diversified had not been granted leave to amend its complaint to appeal the February 27, 2001, administrative decisions which denied that claim, (2) that expenses should be deducted from Diversified's claim for lost profits, and (3) that the February 27, 2001, administrative decisions of the Disputes Contracting Officer were entitled to *res judicata* effect and precluded Diversified's claim for any actual damages. On July 12, 2001, the district court overruled TVA's objections and granted, in part, Diversified's motion for summary judgment. With regard to the jurisdictional issue raised by TVA, the district judge assumed that it had power to comply with this Court's previous mandate that it award Diversified damages in accordance with standard contract law principles, characterizing the procedural posture of the case as "simply the end-stage of Diversified's original breach of contract action not a new lawsuit based upon some separate set of facts." With respect to the lost profits claim, the district court awarded Diversified $1,139,185 (plus interest) in actual damages, reflecting the $.98 per ton in commissions which it would have received from Sigmon if TVA had accepted the remaining tons of coal, less a reduction of $.22 per ton which Diversified had agreed to pay a third party, Billy Evans d/b/a/

B & A Coals, for all coal delivered under the Contract. Finally, the trial court refused to give *res judicata* effect to the unappealed February 27, 2001, administrative decisions because it believed that this Court's prior decision precluded it from finding -- or accepting the Disputes Contracting Officer's findings -- that Diversified's breaches of the "Officials not to Benefit" provision barred it from recovering any damages.

## II.  Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment. *Edwards v. TVA*, 25 F.3d 318, 322 (6th Cir. 2001). The existence of subject matter jurisdiction under the CDA is also reviewed *de novo*. *See Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 891 (6th Cir. 1998).

## III.  Discussion

### A.  Jurisdiction over Diversified's Lost Profits Claim

In this appeal, TVA renews the primary contention that it made to the district court upon remand: that the district court lacked jurisdiction over Diversified's lost profits claim because that claim had not been presented to a Contracting Officer before Diversified filed its original complaint and because Diversified has not amended its complaint to include an appeal of the February 27, 2001, administrative decisions which rejected that claim. The critical assumption underlying TVA's position is that Diversified's May 18, 1993, certified claim -- the basis of the district court's jurisdiction when Diversified initiated suit in 1997 -- failed to make a claim for

lost profits, but instead stated only a claim for liquidated damages.[7]

TVA asserts that Diversified's failure to refer to lost profits expressly in its claim letter violated its duties under the CDA, specifically, 41 U.S.C. §§ 605(a) and 605(c)(1), to ensure that all of its claims were submitted in writing to a Contracting Officer and to certify that the data supporting its claims was accurate and complete. It also claims that Diversified's alleged omission amounted to noncompliance with TVA's implementing regulations which provide, among other things, that a contractor's claim submittal must "[i]nclude sufficient supporting data to permit the Contracting Officer to decide the claim, provide appropriate reference to previously submitted data." 18 C.F.R. § 1308.2(c) (2003). In TVA's view, because Diversified did not comply with these requirements, it did not submit a valid claim for lost profits to the original Contracting Officer and, thus, the original Disputes Contracting Officer did not issue a final decision denying that claim.

---

[7]TVA's assumption is not well-founded, as Diversified's 1993 claim letter clearly stated that it believed itself "entitled to recover from TVA the amount which [it] would have made from delivery of the remaining portion of the maximum commitment under the Contract." This language plainly encompasses a claim for lost profits. *See, e.g., Allen, Heaton & McDonald v. Castle Farm Amusement Co.*, 86 N.E.2d 782, 784 (Ohio 1949) ("When a plaintiff sues on a contract to recover the amount he would have received for the full performance prevented by a defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract which profit defendant's breach prevented him from earning."). It is true that the May 18, 1993, letter states that Diversified identified its lost profits as the amount due under the Unilateral Termination Right clause, but Diversified did not in any way indicate that this was the exclusive measure of damages sought. Instead, it appears that Diversified stated a contract claim for what Diversified "would have made," and then understandably contended that the amount be measured in terms of the contract's liquidated damages remedy.

TVA, as an agency of the United States, enjoys sovereign immunity unless Congress specifically waives it. *See, e.g., Campanella,* 137 F.3d at 890. Under the CDA, Congress has conditionally waived the sovereign immunity of executive agencies which contract with others for services or certain kinds of property. *See, e.g., SMS Data Products Group, Inc. v. United States*, 19 Cl. Ct. 612, 614 (Cl. Ct. 1990). With regard to the TVA, this waiver applies only to contracts, like the one signed by Diversified, which "contain a disputes clause requiring that a contract dispute be resolved through an agency administrative process." 41 U.S.C. § 602(b). One condition which Congress has placed upon the waiver of TVA's immunity under the CDA is the requirement that a contractor exhaust the agency's administrative procedures before filing suit in district court. The purposes of this condition are to encourage resolution of disputes by negotiation prior to litigation and to "keep government contract disputes out of the district courts." *Campanella*, 137 F.3d at 890 (citing *United States v. Kasler*, 123 F.3d 341, 346 (6th Cir. 1997)). An additional, related condition is the requirement that a contractor seeking more than $100,000 in damages present a valid, certified contract "claim" to a Contracting Officer. *See* 41 U.S.C. § 605(c)(1); *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996). This condition serves to ensure that the Contracting Officer is given enough information to evaluate the claim fairly so that a final decision may be reached. *E.g., Colon v. United States*, 35 Fed. Cl. 337, 342 (1996). These conditions are jurisdictional in nature; a failure to satisfy them will preclude the district court from entertaining an appeal of the contractor's claims. *See, e.g., Diversified I*, 223 F.3d at 336; *SMS Data Products*, 19 Cl. Ct. at 615.

The CDA does not define what constitutes a "claim." *Colon,* 35 Fed. Cl. at 340. Under TVA's regulations, that term is defined as a "written demand by a Contractor . . . for a decision by a Contracting Officer under a disputes clause." 18 C.F.R. § 1308.2(c). TVA's regulations specify further that

a claim must, among other things, "state the amount of monetary relief, or the kind of nonmonetary relief, sought," provide "sufficient supporting data to permit the Contracting Officer to decide the claim," and, if greater than $100,000, "include a signed certification by the Contractor that the claim is made in good faith, that the supporting data are accurate and complete to the best of the Contractor's knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the Contractor believes TVA is liable." 18 U.S.C. § 1308.2(c)(1)-(3). The term "claim" is to be interpreted broadly to embrace virtually all disputes arising under or relating to a government contract. *See RMI Titanium*, 78 F.3d at 1135 (citing *Z.A.N. Company v. United States*, 6 Cl. Ct. 298, 303 (1984)).

Under the CDA, a district court is not deprived of jurisdiction over a contract claim merely because the contractor changes the amount of his claim or the theory of his damages, so long as the modified claim is "'based on the same set of operative facts underlying the claim' submitted to the contracting officer." *ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 489 (1996) (quoting *Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987)). "The critical test is whether the contracting officer's right to adjudicate the claims is undermined by circumventing his statutory role 'to receive and pass judgment on the contractor's entire claim.'" *Id.* (quoting *Cerberonics*, 35 Cl. Ct. at 418). This rule recognizes that "it would be very disruptive to a court's procedures, if theories, developed as a result of pretrial proceedings including discovery, had to be submitted to the contracting officer before the court could render a final decision on a claim." *Id.* (citing *J.F. Shea Co. v. United States*, 4 Cl. Ct. 46, 54 (1983)). Hence, as long as Diversified's claim for lost profits was based on the same operative facts as its claim for liquidated damages and did not prevent the Contracting Officer from evaluating whether Diversified was entitled to such a remedy, it was properly before the district court. *See id.*

TVA contends that Diversified submitted no information regarding its lost profits to the Contracting Officer, thus providing him with no opportunity to make a final decision on that claim. TVA specifically asserts that the claim for lost profits was based on different evidence than the liquidated damages claim. TVA's position, however, ignores the reason underpinning the rule enunciated in *ThermoCor* and *Cerberonics*: as long as the contracting agency is given an adequate opportunity to make decisions on the issues presented by a contractor's claim, the subsequent modification (or clarification) of the remedy sought by the contractor does not prejudice the contracting agency and does not, therefore, deprive the district court of jurisdiction over the modified claim. *See, e.g., ThermoCor*, 35 Fed. Cl. at 489-90; *Cerberonics,* 13 Cl. Ct. at 419.

Diversified's claim for lost profits arose from the same operative facts which were before the Contracting Officer in 1993 -- TVA's conduct in repudiating the Contract. Additionally, since the original Disputes Contracting Officer denied Diversified's claim on the issue of liability, he necessarily refused to award Diversified damages under any available remedy theory. The Disputes Contracting Officer was given an adequate opportunity to address the lost profits claim. Therefore, the district court had jurisdiction over Diversified's lost profits claim when Diversified filed its complaint in 1997. Furthermore, since its lost profits claim was properly before the district court by virtue of its original complaint, Diversified had no obligation to amend that pleading to appeal the February 27, 2001, administrative decisions. *See Sharman Company, Inc. v. United States*, 2 F.3d 1564, 1570 (Fed. Cir. 1993). Accordingly, the district court's assumption that it had jurisdiction to award Diversified lost profits was correct.

## B. Diversified's Claim Under the Contract/Market Price Differential

The district court did not err in rejecting Diversified's claim for damages based on the $5.13 per ton difference between the Contract price and the market price. Upon remand, this Court instructed the district court to determine Diversified's damages in accordance with standard principles of contract law. Diversified mistakenly argues here that those principles entitled it to a measure of damages reflective of the contract/market price differential under the Uniform Commercial Code ("UCC"), specifically § 2-708(1).[8] Even

---

[8]This section provides:

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

assuming that the UCC applies,[9] however, Diversified was not entitled to damages under § 2-708(1).

Sigmon -- the entity which actually owned the coal -- paid Diversified a fixed commission of $.98 for each ton of coal delivered to TVA. Diversified was obligated to pay a portion of those commissions, $.22 for each ton delivered, to a third party, Billy Evans, as compensation for his assignment of the Contract to Diversified on June 19, 1980. Hence, as indicated in *Diversified I*, if TVA had performed the Contract fully, Diversified's maximum expectancy would have been $.76 per ton of undelivered coal. *See Diversified I*, 223 F.3d at 338.

A non-breaching party is entitled to be placed in the same position it would have enjoyed had the defendant abided by the contract, but is not entitled to more than the benefit of his bargain. *See, e.g., San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997); *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir. 1984). A damage award which fails to adhere to this principle is unreasonable as a matter of law. *See Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1393 (6th Cir. 1986). The UCC, including § 2-708, has adopted this philosophy. *See, e.g., Nobs Chem., U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 215 (5th Cir. 1980).

---

[9]It is unclear the extent to which the UCC applies to government contracts. *See, e.g., Technical Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1372 (Fed. Cir. 1998) (looking to the UCC for guidance, but concluding that "the Uniform Commercial Code is not binding with respect to government contracts . . . .") (citation omitted); *Northern Helix Co. v. United States*, 455 F.2d 546, 553 (Ct. Cl. 1972) ("This court has explicitly recognized the authority and relevance of the Uniform Commercial Code in the field of public contracts . . . .") (citations omitted). We need not settle this question here, however, since, even assuming that the UCC applies, Diversified is not entitled to the relief it claims.

Diversified relies principally upon *Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, 908 (2d Cir. 1985) to support its argument that it is entitled to damages under § 2-708(1). That case is not applicable, however. Unlike the plaintiff in *Trans World Metals*, Diversified did not assume any risk that the market price of coal would increase. Rather, any such risk was assumed, if at all,[10] by Sigmon -- the only authorized producer of the coal under the Contract. Therefore, Diversified was not entitled to damages based on the contract/market price differential under § 2-708(1). *See Nobs Chem.*, 616 F.2d at 215; *see also Union Carbide Corp. v. Consumers Power Co.*, 636 F. Supp. 1498, 1501-02 (E.D. Mich. 1986). Because Diversified would have received only $.76 per ton of coal had the Contract been performed, the district court properly limited its damages to an amount based on that figure.

**C. The *Res Judicata* Effect of the February 27, 2001, Administrative Decisions**

The February 27, 2001, administrative decisions which purported to resurrect TVA's "Official not to Benefit" defense and to deny Diversified's claims were invalid from the outset and are therefore not entitled to any preclusive effect. Where, as here, a claim for damages under the CDA is in litigation, a Disputes Contracting Officer has absolutely no authority to issue a final decision on that claim. *See Sharman Co. v. United States*, 2 F.3d 1564, 1571-72 (Fed. Cir. 1993), *rev'd on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1580 (Fed. Cir. 1995) (citing *Durable Metal Prods., Inc. v. United States*, 21 Cl. Ct. 41, 46 (1990)). In *Sharman*, there had been no stay of judicial proceedings, and we do not hold

---

[10]As observed by the district court, the reopener provision allowed either party to reopen the Contract (with certain restrictions) for the purpose of negotiating new terms in the event that the market price of coal changed.

that court stays are never appropriate to permit additional administrative proceedings under the CDA. In this case, however, in light of our holding that the district court had jurisdiction over Diversified's lost profits claim when Diversified filed its complaint in 1997, there was no need for the district court to stay the judicial proceedings, and at least in that context the Disputes Contracting Officer's February 27, 2001, decisions must be treated as entitled to no preclusive effect.

## IV. Conclusion

For the foregoing reasons, the district court's decision is **AFFIRMED**.