**William GILLARD**

v.

**Aldine D. MARTIN and
Al–Mar RV, Inc.**

**Appeal of Al–Mar RV, Inc.**

Superior Court of Pennsylvania.

Submitted June 1, 2010.
Filed Dec. 20, 2010.

Darrell N. Van Ormer, Jr., Elizabethtown, for appellant.

Peter M. Good, Harrisburg, for appellee.

BEFORE: FORD ELLIOTT, P.J., MUNDY, J., AND McEWEN, P.J.E.

OPINION BY FORD ELLIOTT, P.J.:

Appellant, Al–Mar RV, Inc. ("Al–Mar"), appeals the entry of judgment in favor of appellee, William Gillard ("Gillard"), in the amount of $184,982.72. We affirm.

Gillard commenced this suit by filing a complaint on May 18, 2006, against Al–Mar and its owner, Aldine D. Martin ("Martin"), in his individual capacity, for breach of an employment contract, as well as counts alleging detrimental reliance and fraud in the inducement. Al–Mar filed a counterclaim in which it also alleged breach of contract. The trial court dismissed Gillard's claims for detrimental reliance and fraud in the inducement on April 21, 2008. A three-day bench trial was held on the remaining breach of contract claims from December 15 to December 17, 2008. At the close of Gillard's case, Al–Mar and Martin moved for non-suit. At the conclusion of all testimony, Al–Mar and Martin moved for a directed verdict and Gillard moved for a directed verdict as to the counterclaim.

On June 18, 2009, the trial court reached its decision, entering an opinion and order that day. Essentially, the court found no liability on the part of Martin, in his individual capacity, but found that Al–Mar, and not Gillard, had breached the employment contract, and awarded damages in the amount previously stated. Following the denial of Al–Mar's post-trial motions, Gillard filed a praecipe to enter judgment on July, 21, 2009. On July 30, 2009, Al–Mar filed this timely appeal.[1]

The following findings of fact, stated in the trial court's opinion of June 18, 2009, are germane to our review:

1. We note in passing that the trial court ordered Al–Mar to file a concise statement of errors complained of on appeal, and that Al–Mar failed to do so within the 21 days allotted, which would ordinarily serve to waive all issues on appeal. *See* Pa.R.A.P., Rule 1925(b)(4), 42 Pa.C.S.A.; *Commonwealth v. Castillo*, 585 Pa. 395, 888 A.2d 775 (2005). However, on October 19, 2009, Al–Mar filed an application for remand with this court, pursuant to Rule 1925(c)(2). On November 19, 2009, this court granted the motion. Thereafter, the record was remanded for the filing of a concise statement of errors complained of on appeal *nunc pro tunc*, and a supplemental opinion addressing those matters.

Defendant Al–Mar RV, Inc. operates under the trade name Keystone RV and is wholly owned by Aldine Martin. Martin is a successful local business man, having owned and operated several area businesses including grocery stores and car dealerships over the course of many years. Martin established Al–Mar RV to do business as Keystone RV in the recreational vehicle industry, selling various types of RV's, motor homes, campers, and trailers in Greencastle, Pennsylvania.

At some point, Martin became unhappy with the poor return on investment that Al–Mar RV was generating. An acquaintance in the RV industry suggested that Martin contact Plaintiff William Gillard. Gillard had experience in the RV industry dating to 1989, and had been a successful manager of several RV dealerships. Martin contacted Gillard and paid the travel expenses for Gillard to visit Keystone RV in late 2004.

Before meeting with Martin, Gillard visited the dealership and posed as a customer at Martin's suggestion. He concluded that Keystone RV had some deficiencies, but also had the promise and potential to be turned around and made profitable. Based on his visit, Gillard felt that the inventory was aged and the salespeople were not very knowledgeable or friendly, but those and other issues could be remedied.

After visiting the dealership, Gillard met Martin at a local restaurant to discuss the potential of Gillard taking a management position at Keystone. Martin expressed his desire to make more profit from his investment, Keystone RV, and stated his frustration that the company had been through six or seven general managers who simply could not produce the results Martin desired. By his own testimony, it was at this meeting that Martin disclosed to Gillard his romantic but non-sexual relationship with a Keystone employee. The evidence also revealed that Martin provided this employee with a two page employment contract drafted by the employee's sister, who is not an attorney, and was executed January 26, 2005, before Gillard began working at Keystone. The existence of this contract was not revealed to Gillard. The two men also discussed a preliminary agreement, providing that Gillard's moving expenses would be covered up to $4,000 and that he would have a base salary with bonuses based upon the company's net profit.

Gillard moved to Franklin County in early 2005 and began work as general manager on February 28 of that year. While Gillard searched for housing, Martin permitted him to stay in one of the motorhomes on Keystone's lot. Because Martin was tired of going through general managers, he was agreeable to a five-year employment contract and an Employment Agreement dated July 25, 2005 was prepared. That Agreement, drafted by Gillard, provided that Gillard would not commit any theft or crime against the company, continue to give his best effort, Gillard would have full authority to act on behalf of Keystone RV as General Manager, the term of the contract would be five years from January 1, 2005, and Gillard's salary would be $150,000.00 per year. Both Gillard and Martin testified to the terms of the contract and its validity was not challenged. The 2005 Employment Agreement was a valid contract between the parties, signed by Gillard as employee and signed by Martin in his capacity as president of Al–Mar RV, doing business as Keystone RV. Martin testified that even though the document did not indicate he was signing as president, he customarily signs documents that come

across his desk assuming that he is signing for the corporation. Thus, there was a contract between Gillard and Al-Mar RV.

In his position as general manager of Keystone RV, Gillard began by "cleaning house." He fired workers that did not want to subscribe to Gillard's new way of doing business. Gillard worked with the sales, service, and parts departments to make improvements all around the dealership. He hired new salespeople and trained them on a specific sales track. Through the end of 2005, it appeared that the business was improving.

The relationship between Gillard and Martin began to deteriorate in early 2006. Defendant put on varied testimony that tended to paint Gillard as rough, crass, rude, and unsavory. Though he may have been rude to or sworn at customers on various occasions, and Martin disagreed with some business decisions that Gillard made, there is one clear precipitating event that marked the downfall of the relationship: Gillard fired Martin's romantic friend.

Testimony by the witnesses for both parties revealed increased tension in the workplace after Gillard fired Martin's friend. It was common knowledge at Keystone RV that Martin would spend time with his friend in a trailer at the back of the lot. Gillard terminated the friend's employment because he believed, and Martin's testimony agreed, that it was improper for the owner to have a romantic relationship with an employee.

There was a great deal of testimony as to what Gillard's "full authority" meant under the Employment Agreement, but it is very apparent that as general manager, with full authority, that Gillard had the power to hire and fire employees. Martin did not object when Gillard had fired other employees, but Martin testified that Gillard did not have the authority to fire Martin's special friend by virtue of that romantic relationship. Martin did not make Gillard aware of the employment contract between himself and the friend, and Gillard testified that he was unaware of the contract because it was not in the friend's personnel file. Additionally, after the firing, Martin continued to provide his friend with health insurance coverage at the expense of the business. The friend later resumed working for the company after Gillard left Keystone.

Thus, the firing of Martin's friend was the rolling snowball that became the avalanche of Martin and Gillard's fallout. Following that firing, Gillard felt that Martin began to undermine his authority as general manager by telling employees he'd hire them back if Gillard fired them and providing sales literature to the salespeople that was contrary to what Gillard had been teaching them. Eventually, Gillard confronted Martin on March 9, 2006. As a result of that meeting, Martin signed a document whereby he agreed to refrain from undermining Gillard's direction, consult with Gillard before giving directions to employees, and promised not to violate the employment agreement again. Martin would be given five days to cure any future breaches.

Many witnesses testified that the office atmosphere continued to decline through March. Martin posted a sign on his door instructing Gillard to stay out. Martin held a meeting with employees and assured them they could have their jobs back if Gillard fired them. The testimony showed that Gillard was not a pillar of civility through this period, either, but particularly disturbing to the fact-finder was Martin's credibility.

Martin testified that there were no problems with Gillard or in the office until Martin received a letter from Gillard's attorney in April. However, Martin's own witnesses testified as to the deterioration in office morale beginning with the firing of Martin's friend some months prior. When pressed during his testimony, Martin only reluctantly admitted that he had a relationship with the employee, but defiantly stood by his claim that there had been no sexual activity with the friend during the period of Gillard's employment. Martin also testified that he did not read and did not discuss the March 9, 2006 document with Gillard, even though that document contains language purely for the employee's benefit. Martin's assertions as to these matters were not credible.

Gillard filed a Civil Complaint to initiate the action on May 18, 2006. After being served with the complaint, Martin revoked Gillard's check-writing authority on behalf of the company and placed an advertisement seeking a new general manager. Gillard testified that by the week of June 9 through June 16, 2006 he had no authority whatsoever as general manager. Gillard resigned June 16, 2006.

Trial court opinion, 6/18/09 at 14–19 (footnote omitted).

Al–Mar raises the following issues on appeal:

A. WHETHER BY FILING A COMPLAINT ON MAY 18, 2006, ALLEGING BREACH OF CONTRACT CLAIMING LOSS OF INCREASE IN SALARY AND BENEFIT OF THE BARGAIN, THE PLAINTIFF AS A MATTER OF LAW WAS PRECLUDED FROM RELYING ON CONDUCT PRIOR TO MAY 18, 2006 IN SUPPORT OF HIS CONTENTION THAT HE WAS ENTITLED TO TERMINATE THE EMPLOYMENT CONTRACT?

B. WHETHER BY FAILING TO PLEAD SUFFICIENT POST–COMPLAINT FACTS ESTABLISHED A BREACH OF CONTRACT THE PLAINTIFF AS A MATTER OF LAW COULD NOT RELY ON ANY SUCH POST–COMPLAINT ACTS TO SUPPORT HIS CLAIM FOR BREACH OF CONTRACT?

C. WHETHER THE LOWER COURT COMMITTED AN ERROR OF LAW WHEN IT AWARDED DAMAGES FOR LOSS OF FUTURE WAGES WHEN THE PLAINTIFF ONLY CLAIMED IN HIS COMPLAINT LOSS OF INCREASES IN SALARY AND BENEFIT OF THE BARGAIN AND NEVER AMENDED THE COMPLAINT TO INCLUDE A CLAIM FOR LOSS OF FUTURE WAGES?

D. DID THE LOWER COURT ERR AS A MATTER OF LAW WHEN IT FOUND THAT CERTAIN ACTIONS OF ALDINE MARTIN SUBSEQUENT TO MARCH 9, 2006 CONSTITUTED A BREACH OF CONTRACT WHEN THOSE ACTS WERE WITHIN HIS AUTHORITY AS THE OWNER OF AL–MAR RV, INC.?

Al–Mar brief at 4.

Al–Mar's issues on appeal derive from the denial of its motion for nonsuit and from the interpretation of the underlying employment contract. We note the following standards of review:

Our standard of review is well-established: "A nonsuit is proper only if the jury, viewing the evidence and all reasonable inferences arising from it in the

light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had been established." *Brinich v. Jencka,* 757 A.2d 388, 402 (Pa.Super.2000), *appeal denied,* 565 Pa. 634, 771 A.2d 1276 (2001) (citation and internal quotation marks omitted). Furthermore, all conflicts in the evidence must be resolved in the plaintiff's favor. *See Gigus v. Giles & Ransome, Inc.,* 868 A.2d 459, 461 (Pa.Super.2005), *appeal denied,* 586 Pa. 758, 895 A.2d 550, 2006 WL 544541 (2006). In reviewing the evidence presented we must keep in mind that a jury may not be permitted to reach a verdict based on mere conjecture or speculation. *See Brinich,* 757 A.2d at 402. We will reverse only if the trial court abused its discretion or made an error of law. *See Weiner v. Fisher,* 871 A.2d 1283, 1285 (Pa.Super.2005).

*Harvey v. Rouse Chamberlin, Ltd.,* 901 A.2d 523, 526 (Pa.Super.2006). Further:

> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

*Calabrese v. Zeager,* 976 A.2d 1151, 1154 (Pa.Super.2009), quoting *Kraisinger v. Kraisinger,* 928 A.2d 333, 339 (Pa.Super.2007). With these standards in mind, we now turn to our review of Al–Mar's issues.

■ In its first issue, Al–Mar contends that Gillard was prohibited from proving a breach of contract by conduct which occurred prior to May 18, 2006. According to Al–Mar, because Gillard filed his breach of contract action on that date, and yet continued to perform his contractual job duties after that date, he is barred from proving breach under the doctrine of election of remedies. Al–Mar quotes Williston on Contracts to support this claim:

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights— he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach— but the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain. Thus, for example, if an employment contract provides that the employee is entitled to certain compensation on termination of his contract, the employee can elect to terminate the contract upon a material breach by the employer and recover the stipulated compensation, or the employee can treat the breach as immaterial, continue the contract, and recover damages caused by the breach.

13 R. Lord, Williston on Contracts (4th Ed. 1990), § 39:32, p. 645 (in pertinent part) (footnotes omitted).[2]

Thus, according to Al–Mar, Gillard cannot rely on the pre-lawsuit conduct to prove a total breach since Gillard elected to accept the pre-lawsuit conduct as imma-

---

2. Al–Mar also cites to the Restatement (First) of Contracts at § 309. We have used the Williston formulation because it is much more lucid. We also note that Gillard and the trial court both observe that Al–Mar has not cited any Pennsylvania authority adopting either Restatement, § 309 or Williston, § 39:32. Our analysis assumes that even if these sections were adopted, Gillard's position is still correct.

terial, and continued working under the contract.[3] Unfortunately, in making its argument, Al–Mar has selectively quoted Williston. We note that the same section goes on to declare the following:

> Finally, it should be kept in mind that although a default unquestionably may be waived by continuing to perform or accepting performance despite a breach or failure of a condition, where the non-defaulting party brings his or her complaints to the defaulting party's attention, and continues the relationship only on the assurance of better future performance, he or she will not be barred from asserting rights under the contract; in such a case, the successive acceptances of performance do not justify the belief that performance of the character tendered was satisfactory, and a waiver of the right to the promised performance cannot be found.

*Id.* at 646 (in pertinent part) (footnotes omitted).

This latter described situation is, of course, exactly what transpired instantly. When Al–Mar's conduct was seen by Gillard as a breach of their employment agreement, Gillard approached Martin and aired his grievances. Thereafter, by a written agreement signed on March 9, 2006, Martin gave Gillard his assurance of better future performance. Thus, under the doctrine put forward by Al–Mar, as *fully* fleshed out by Williston, Gillard had every right to rely upon pre-lawsuit conduct to prove a total breach.

Al–Mar relies upon two cases in support of its position. In *Agsco Equipment Corp. v. Borough of Green Tree,* 297 Pa.Super. 33, 443 A.2d 284 (1981), Agsco entered into a June 1972 agreement with the Borough to use certain property, owned by a third party school district, as a landfill. The use of the land for this purpose was contingent upon the Borough obtaining a lease for the land from the school district. Agsco became aware of the need for a lease in July 1972, and that presently, no such lease existed. Agsco began dumping on the land in late 1972 or early 1973. Agsco requested that the Borough obtain the necessary lease in September 1973. Shortly thereafter, environmental agencies caused Agsco to cease operation of the landfill. Agsco then sued the Borough for breach of their agreement on the basis that the Borough had failed to obtain the necessary lease from the school district. The trial court held, and this court affirmed on appeal, that Agsco waived the right to assert a breach on this basis because it continued its performance in the knowledge that the Borough had not obtained the needed lease.

We see two distinctions from the present case. First, Agsco began performance with knowledge of the breach and continued doing so for approximately ten months. Here, when Gillard perceived that Al–Mar was in breach in early 2006, he acted almost immediately, approaching Martin in early March. After getting assurances from Martin at that time, Gillard resumed performance. When it immediately became obvious that the breaching conduct was nevertheless going to continue, Gillard again acted with dispatch, having his attorney send Al–Mar a letter in April, and filing suit in May. Clearly, in *Agsco,* Agsco continued performance, for ten long months, in obvious acceptance of the Borough's breach. Here, Gillard's conduct never clearly amounted to acceptance, because he immediately objected

---

**3.** Also implicit in Al–Mar's argument is a claim that Gillard was in breach of the contract when he later declared a total breach

and refused to continue to abide by his part of the bargain after initially accepting Al–Mar's conduct.

when he perceived conduct amounting to breach.

The second distinction is that Agsco never approached the Borough, never voiced its objections, never insisted that the breach cease, and never obtained the Borough's agreement to cure the breach; rather, Agsco merely requested that the Borough obtain a lease ten months after Agsco had begun performance. Instantly, of course, Gillard approached Al–Mar with his concerns and received Al–Mar's promise to cure the breach.

Further, as indicated by the trial court's opinion, *Agsco* actually supports Gillard's position:[4]

> The principle is general that whenever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, *unless the right to retain the excuse is not only asserted, but assented to.*

*Agsco,* 443 A.2d at 287 (emphasis added), quoting *Gray v. Maryland Credit Finance Corporation,* 148 Pa.Super. 71, 25 A.2d 104, 106–107 (1942). On March 9, 2006, Gillard asserted the right to retain the excuse, and by signing the March 9, 2006 document, Al–Mar assented to the retention of the right.

The other case cited by Al–Mar, *Savitz v. Gallaccio,* 179 Pa.Super. 589, 118 A.2d 282 (1955), is similarly distinguished. In *Savitz,* Savitz entered an employment contract with Gallaccio to supervise the construction of a sewer. The project was to begin in February 1952. At that time, however, Savitz was hospitalized and could not begin performance. Gallaccio did not object or otherwise declare a breach. Instead, an interim supervisor was hired, and Savitz was permitted to commence his

duties on May 28, 1952. Ultimately, Gallaccio fired appellant on November 5, 1952. In Savitz's subsequent suit for breach of contract, Gallaccio attempted to argue on appeal that Savitz breached the agreement by failing to begin performance in February 1952. This court held that while Gallaccio could have used the failure to perform in February as a basis to rescind the contract, his subsequent hiring of an interim supervisor and acceptance of Savitz's performance starting in May justified a finding by the jury that the parties were proceeding under the original agreement.

*Savitz* is distinct on the same bases as noted earlier. Gallaccio allowed Savitz to continue performance for over five months despite knowledge of the breach, and Gallaccio never approached Savitz and demanded that Savitz cure the breach.

We see no error of law committed by the court below in permitting Gillard to rely upon pre-lawsuit conduct to prove a total breach. Gillard did not elect another remedy. As soon as Gillard detected a breach, he went to Martin and obtained a promise to cure the breach. When it became apparent that the breach was going to continue, Gillard promptly acted and declared a breach.

In its next argument, Al–Mar contends, essentially, that since Gillard could not rely on pre-lawsuit conduct, and failed to amend his complaint to allege any post-lawsuit conduct, there was no basis for the verdict. Since we have already ruled that Gillard could rely on pre-lawsuit conduct to prove a total breach, this issue is without merit.

Moreover, to the extent that this issue implies that post-lawsuit conduct was improperly introduced at trial and was improperly considered by the jury, Al–Mar fails to indicate what that evidence was,

---

4. *See* trial court's opinion, 6/18/09 at 12–14.

and where in the record it was introduced. Consequently, this aspect of this issue has been insufficiently briefed. *See* Pa.R.A.P., Rule 2119(c), 42 Pa.C.S.A. Nonetheless, our review of the transcript reveals that the conduct of Al–Mar (through Martin) of which Gillard complained was essentially the same pre- and post-breach: interfering with Gillard's operation of the business, primarily by giving conflicting instructions to employees, and by conducting questionable business practices. This interference with the employees was pleaded in the complaint,[5] as was the questionable business practice.[6] Thus, Gillard did not need to amend the complaint to introduce post-lawsuit evidence pertaining to these broad matters. For instance, because he had already pleaded employee interference, Gillard could introduce evidence that Al–Mar interfered with employees post-lawsuit by holding a meeting of employees at which employees were told if Gillard fired them Al–Mar would re-hire them.[7] We see no merit here.

■ Al–Mar next complains that it was improper for the court below to award damages for loss of future wages where the complaint only claimed damages in the form of loss of increases in salary and loss of the benefit of the bargain.

The employment agreement at issue was drafted by a layman and its simplicity reflects that origin. The entire agreement has only five clauses, and Gillard's compensation was addressed in the fifth clause:

> 5. Bill Gillards [sic] compensation shall be $150.000[sic]. Per year. Salary increases shall be reviewed on an annual basis after the year end. It is understood that there will be compensation increases during the term of this agreement. The increases shall only occur because of increased growth.

Employment Agreement, 7/25/05 (Record Document No. 82, attached as Exhibit A to the Complaint).

Simply stated, we find that the request for damages for lost salary increases encompassed both the increase and the underlying $150,000 base salary as well, and that the complaint was clearly seeking the sums Gillard would have received over the term of the employment contract if Al–Mar had not breached the agreement. This is especially so where the complaint also claimed damages based on the fact that Gillard had been denied the benefit of his bargain. Had Gillard received the benefit of his bargain, he would have received his base salary plus possible increases for each year of the five-year term of the contract. We find that Al–Mar's argument simply splits a fine linguistic hair.

■ Finally, "[i]n a breach of contract of employment case, the measure of damages is the wages which were to be paid less any amount actually earned or which might have been earned through the exercise of reasonable diligence in seeking other similar employment." *Appeal of Edge*, 147 Pa.Cmwlth. 27, 606 A.2d 1243, 1246 (1992), citing *Coble v. Metal Township School Dist.*, 178 Pa.Super. 301, 116 A.2d 113 (1955); *see also Delliponti v. DeAngelis*, 545 Pa. 434, 443, 681 A.2d 1261, 1265 (1996). This is precisely the calculation that the trial court performed in assessing damages. (*See* trial court's opinion, 6/18/09 at 20–22.)

■ In its final argument, Al–Mar contends that insufficient evidence of a breach

---

5. *See* Complaint, filed May 18, 2006, at paragraphs 17 and 27.

6. *See* Complaint, filed May 18, 2006, at paragraph 18.

7. Notes of testimony, 12/15/08 at 110.

was presented because Martin, as the business owner of Al–Mar, had the authority to take all of the actions complained of, such as providing sales literature to salespersons that was contrary to sales techniques Gillard was teaching them, or telling employees that if Gillard fired them, Al–Mar would rehire them. According to Al–Mar:

> The contract at issue prepared by Gillard states nothing more than that he has full authority as general manager. There is nothing about a general manager that usurps the authority of the business owner.

Al–Mar brief at 23.

Martin testified at trial as to his own understanding as to the extent of Gillard's authority:

A  Yeah, I gave him full authority.

Q  You wanted him to hire people, fire people, grow profits, do deals, do everything?

A  He was allowed to do that.

Q  You wanted him to do that?

A  Yes.

Q  That was his job?

A  Yeah.

Notes of testimony, 12/17/08 at 24.

Gillard was hired because Al–Mar's business was doing poorly. Gillard's contractual right to salary increases was tied directly to his ability to increase profits. (*See* clause 5 of the Employment Agreement, *supra.*) The clear expectation of the parties was that Gillard would come in and take over, taking whatever measures were necessary in order to rescue a failing business. On Gillard's part, he relocated and took the position because he was given the understanding by Al–Mar that he would be given unfettered leeway to run the business, and thereby increase his own income. While Martin certainly had every right as the business owner to intervene and countermand any directive of Gillard, if in so doing, his mismanagement caused Al–Mar not to realize increased profits, and consequently caused Gillard not to realize salary increases, then Al–Mar would have breached the agreement and would be liable for damages to Gillard. The evidence was more than sufficient to prove breach of contract.

Accordingly, having found no merit in any of the issues raised on appeal, we will affirm the judgment entered below.

Judgment affirmed.