J-A22032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MEECO, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CLEAN GROWTH FUND III, LP, | : | |
| CLEAN GROWTH FUND IV, LP AND | : | |
| NORTH SKY CLEANTECH VENTURES, | : | No. 438 EDA 2019 |
| LP | : | |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JERRY RIDDLE AND LISA BERGSON | | |

Appeal from the Order Entered December 31, 2018
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2018-03133-0040

BEFORE:  MURRAY, J., STRASSBURGER, J.<sup>*</sup>, and PELLEGRINI, J.<sup>*</sup>

MEMORANDUM BY PELLEGRINI, J.:          **FILED OCTOBER 03, 2019**

Clean Growth Fund III, LP, Clean Growth Fund IV, LP, and North Sky

Cleantech Ventures, LP (collectively, North Sky) appeal from the order of the

Court of Common Pleas of Bucks County (trial court) granting MEECO, Inc.'s

---

<sup>*</sup> Retired Senior Judge assigned to the Superior Court.

(MEECO) Motion for Judgment on the Pleadings on the Declaratory Judgment count of its complaint. After careful review, we affirm.

**I.**

**A.**

We take the following pertinent facts and procedural history from the trial court's March 6, 2019 opinion and our independent review of the certified record. MEECO is a Pennsylvania corporation. North Sky is a limited partnership organized under Minnesota law, with its principal places of business there. Tiger Optics, LLC (Tiger) is a Pennsylvania Limited Liability Company organized into three classes of ownership units under an Amended and Restated Operating Agreement (Operating Agreement). The organizing structure consisted of Series A Preferred units (Series A), Common units primarily owned by MEECO, Jerry Riddle (Riddle) and Lisa Bergson (Bergson),[1] and Series B Preferred units (Series B), which were mostly owned by North Sky.

Under this structure, MEECO, Riddle and Bergson held an equity stake of 61% prior to sale. North Sky, Riddle and Bergson held all of the seats on Tiger's Governing Board (the Board). North Sky obtained its Series B stake through investments, the last of which was in late 2016. Under the Operating

---

[1] Riddle and Bergson are officers of MEECO and they served as officers of Tiger. (**See** MEECO, Riddle and Bergson's Brief, at 12).

Agreement, holders of Series B units obtain the liquidation preference and the conversion preference, which are triggered by certain events. Under the liquidation preference, the preference at issue here, Series B holders were to receive 150 percent of the Initial Series B Preferred Value plus any declared but unpaid dividends.[2]

Prior to making the final investment, North Sky alleged that it sought confirmation of the pattern of distributions between the classes of owner that would occur in the event of Tiger's sale. Riddle purportedly provided express assurances to North Sky that Section 10.2 of the Operating Agreement would be triggered in the event of Tiger's sale in spite of his belief that Section 10.2 would only be applicable if the sale was structured as an asset sale. In reliance on Riddle's representations, North Sky purportedly made the two million dollar investment.

In 2017, the Board solicited buyers for the Membership units of Tiger. It sought ownership interest buyers instead of asset purchasers because Tiger had been operating as a C Corporation since 2008 for tax purposes. The Board

---

[2] Under the conversion preference, Series B holders had the right to convert their Series B units into Common units at any point in time but would not be entitled to the liquidation preference. (**See** Operating Agreement, at § 9.3). The conversion formula in Section 9.3 of the Operating Agreement contained terms that would enable the holders of the Series B units to increase their proportional equity interests from 35 percent to approximately 48 percent of the equity interests in Tiger Optics.

believed that an asset sale would present major tax consequences. It reached a sales agreement with an external buyer, Cosa Xentaur Corporation (Cosa).

Before closing, the Board sought to determine the distribution of the proceeds of the sale to satisfy creditors and equity holders. The Board members disagreed about whether the Series B units were entitled to a preferential share of the distribution of the proceeds based on Sections 9.2 and 10.2 of the Operating Agreement. The disputed distribution amount is $1,138,745.00. The Board initially deadlocked, jeopardizing the sale, but eventually it agreed to complete the pending sale and place the disputed amount in escrow pending the outcome of this case.

**B.**

On June 6, 2018, MEECO filed a complaint against North Sky consisting of: (1) a claim for a declaratory judgment that Article 10 of the Operating Agreement does not apply to the transaction with Cosa and that, upon completion of closing, any funds held in escrow should be distributed to the sellers of the Membership units without any preference under Section 10.2; (2) an alternative claim for breach of contract; and (3) aiding and abetting Riddle and Bergson's breach of fiduciary duty. (**See** Complaint, at 9-14).

North Sky filed an answer and a counterclaim for a declaratory judgment seeking a declaration that, as a Series B unitholder, it was entitled to the sale preference payment described in Sections 9.2 and 10.2 of the Operating Agreement. (**See** Answer, New Matter and Counterclaim, at 20). It filed a

joinder complaint against Riddle and Bergson on July 30, 2018, for fraud (against Riddle) and breach of fiduciary duty (against Riddle and Bergson). (*See* Joinder Complaint, at 8-11). Riddle and Bergson filed preliminary objections in the nature of demurrer.

On September 7, 2018, MEECO filed a motion for judgment on the pleadings as to the competing declaratory judgment claims. It argued that the sale of the Membership units was not a sale of Tiger's assets, which MEECO maintained was required under the Operating Agreement for the Series B Sale Preference to be paid. (MEECO's Memorandum of Law in Support of Judgment on the Pleadings, at 15-32). North Sky countered that (1) Sections 9.2 and 10.2 of the Operating Agreement require the sale preference to be paid in connection with any "Transfer" or disposition of assets, and the sale of Tiger necessarily "Transferred" all the assets to new ownership, and (2) even if MEECO were correct in its interpretation of the Operating Agreement, the most this would mean is that it is silent on how proceeds of the sale are to be distributed, thus making it ambiguous and rendering judgment on the pleadings inappropriate. (*See* North Star's Answer to Motion for Judgment on the Pleadings, at 12-17).

On December 31, 2018, the trial court granted judgment on the pleadings on the declaratory judgment count in favor of MEECO because "[t]he unambiguous language of the Operating Agreement does not provide for any liquidation preference for Series B Preferred Units in the event of a sale of the

Membership Units." (Order, 12/31/18). It sustained Riddle and Bergson's preliminary objection to the breach of fiduciary duty claim and dismissed that count of the Joinder Complaint. (*See id.*). It overruled the preliminary objection to the fraud claim. North Sky timely appealed the dismissal of the declaratory judgment count of its action.[3]

## II.

On April 10, 2019, MEECO, Riddle and Bergson filed an application to quash this appeal as interlocutory that was denied *per curiam*. Because the *per curiam* order did not explain this Court's reasoning for denying the motion to quash, we will briefly do so now.

It is well-settled that our court's appellate jurisdiction is largely limited to appeals from final orders of courts of common pleas.[4] *See* 42 Pa.C.S. § 742. "A final order is generally one which terminates the litigation, disposes of the entire case, or effectively puts the litigant out of court." *Joseph F.*

---

[3] "Our standard of review of the grant of a motion for judgment on the pleadings is limited. A motion for judgment on the pleadings will be granted where, on the facts averred, the law says with certainty that no recovery is possible." *Metcalf v. Pesock*, 885 A.2d 539, 540 (Pa. Super. 2005) (citations and quotation mark omitted). "Because contract interpretation is a question of law," our standard of review is *de novo*. *Gillard v. Martin*, 13 A.3d 482, 487 (Pa. Super. 2010) (citations omitted).

[4] "Whether this Court has jurisdiction to entertain this appeal presents a threshold issue. Such an issue raises a question of law; accordingly, our standard of review is *de novo*, and our scope of review is plenary." *Pa. Manufacturers' Assoc. Ins. Co. v. Johnson Matthey, Inc.*, 188 A.3d 396, 398 (Pa. 2018) (citations omitted).

- 6 -

***Cappelli & Sons, Inc. v. Keystone Custom Homes, Inc.***, 815 A.2d 643, 648 (Pa. Super. 2003) (citation omitted); ***see*** Pa.R.A.P. 341(b).

However, Pennsylvania Rule of Appellate Procedure 311 provides, in pertinent part, that "[a]n appeal may be taken as of right . . . from . . . [a]n order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties."  Pa.R.A.P. 311(a)(8).  Pursuant to Section 7532 of The Pennsylvania Declaratory Judgments Act:

> Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. . . .  The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.

42 Pa.C.S. § 7532; ***see also Nationwide Mut. Ins. Co. v. Wickett***, 763 A.2d 813, 817 (2000) ("[A]ny order in a declaratory judgment action that either affirmatively or negatively declares the rights and duties of the parties constitutes a final order.").  The ***Pa. Manufacturers'*** Court observed that this general rule has been refined and, "[i]f the order in question merely narrows the scope of the litigation and does not resolve **the entirety of the parties' eligibility for declaratory relief**, then the order is interlocutory and not immediately appealable."  ***Pa. Manufacturers***, ***supra*** at 400 (citation omitted) (emphasis added).

MEECO, Riddle and Bergson argue that the court's order narrowed but did not completely resolve the fundamental issue in this case.  (***See*** MEECO,

Riddle and Bergson's Brief, at 5). North Sky maintains that this is an interlocutory appeal taken as of right pursuant to Pennsylvania Rule of Appellate Procedure 311(a)(8) and Section 7532 of The Declaratory Judgments Act. (*See* North Sky's Brief, at 1-2). We agree with North Sky that the trial court's order is immediately appealable.

The order granted MEECO's motion for judgment on the pleadings as to the declaratory judgment count of its complaint and expressly held that "[t]he unambiguous language of the Operating Agreement does not provide for any liquidation preference for Series B Preferred Units in the event of a sale of the Membership Units." (Order, 12/31/18). This did not merely narrow the declaratory judgment issue but resolved "the entirety of the parties' eligibility for declaratory relief[.]" *Pa. Manufacturers*, *supra* at 399. Because the order is appealable, we will now consider the merits of North Sky's appeal.

## III.

North Sky contends that the trial court erred in finding that Sections 9.2 and 10.2 of the Operating Agreement do not require that the liquidation preference be paid because the sale to COSA was a transfer within the meaning of those provisions triggering the preference. Section 9.2 of the Agreement provides:

> **9.2  Mergers and Consolidations.** In the event of a Capital Transaction any consideration provided to the Members in connection with such Capital Transaction shall be allocated or distributed, as appropriate, in accordance with Section 10.2.

(Operating Agreement, at 43 § 9.2).[5] "Capital Transaction" is defined as "any

Transfer of all or substantially all of the **assets** of the Company and its

---

[5] Section 10.2 of the Operating Agreement provides for the order of priority for the distribution of assets upon the Liquidation and Termination of Tiger. It provides, in pertinent part:

> **10.2 Liquidation and Termination.** On dissolution of the Company, . . . [t]he liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Law. . . . The steps to be accomplished by the liquidator are as follows:
>
> (a) as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made . . . ;
>
> (b) the liquidator shall apply the assets of the Company remaining after payment of the costs and expenses of winding up in the in the following priority:
>
> (i) First, to the creditors of the Company . . . in the order of priority established by law;
>
> (ii) Second, to the Members holding Series B Preferred Units, an amount equal to 150 percent of the Initial Series B Preferred Value plus any declared, but unpaid, Series B Preferential Distributions;
>
> (iii) Third, to the Members holding Series A Preferred Units, an amount equal to the Initial Series A Preferred Value; plus any declared, but unpaid Series A Preferential Distributions; and
>
> (iv) Fourth, to Members holding Series B Preferred Units and Common Units **pro rata** in accordance with their Sharing Percentages.

(Operating Agreement, at 59-60, § 10.2) (emphasis in original).

subsidiaries[.]" North Sky argues that the COSA sale was a Capital Transaction, defined as "any transaction referenced in 2.3(b)(ii)(F)," which refers to "any Transfer of all or substantially all of the assets of the Company or its subsidiaries." (*Id.* at 6 § 2.3(b)(ii)(F), 67 § 12.1). It observes that the Operating Agreement defines "Transfer" as "the assignment, *transfer,* license pledge, mortgage, grant of security interest in, encumbrance, exchange or gift *or other disposition*." (*Id.* at 73 § 12.1) (emphasis added). Because the definition of Capital Transaction includes the term "transfer," it contends that means the COSA sale is the "transfer" or "other disposition" of the assets of the Company.

However, what that argument ignores is that the definitions of "Capital Transaction" specifically involves a transfer of the "assets" of the Company, which is not even specifically mentioned in the definition of "Transfer." The question here is whether the sale of the membership interests in the Company was the sale of an "asset."

We have held that a "membership interest is an ownership interest in a limited liability company and is akin to an interest in stock of a corporation." *Missett v. Hub Intern. Pa., LLC*, 6 A.3d 530, 537 (Pa. Super. 2010) (internal quotation marks omitted). The sale of stock is not a sale of a corporation's assets because "a corporation is an entity irrespective of . . . the persons who own its stock." *Id.* (citation omitted). Similarly then, the sale of membership interests in a limited liability company, like the sale of stock, is not the sale of

assets. *See id.*; *see also* 15 Pa.C.S.A. § 8852(a)(2) ("[A] transfer, in whole or in part, of a transferable interest [in a limited liability company] . . . does not by itself cause . . . a dissolution . . . of the limited liability company's activities and affairs[.]").[6]  Therefore, the trial court properly found that the sale of the Membership units was not a "Capital Transaction" within the meaning of Section 9.2 of the Operating Agreement based on its unambiguous language.

North Sky next argues that even if the trial court properly declared that it was not entitled to Series B preference payments, the Operating Agreement still is ambiguous because it does not state how to distribute the proceeds of the Cosa transaction.  (*See* North Sky's Brief, at 32-37).

First, we observe that this issue is outside the scope of the limited issue that both MEECO and North Sky asked the trial court to decide whether:  North Sky was entitled to preferential treatment under Sections 9.2 and 10.2 of the Operating Agreement for the proceeds of the Cosa transaction.  This is the

---

[6] Similarly, North Sky's reliance on Section 4.1 of the Operating Agreement, for the method of distributing Available Cash, is likewise unavailing because the sale of the Membership units did not result in Available Cash.  (*See* North Sky's Brief, at 34-35); (*see also* Operating Agreement, at 24-25 § 4.1). "Available Cash" is defined as "cash funds from Operations on hand or on deposit . . . as the Board . . . shall deem available for distribution [or] proceeds received after the payment of all expenses incurred in connection with a Capital Transaction."  (Operating Agreement, at 66 § 12.1).  The transaction with Cosa did not involve a Capital Transaction and the proceeds of the sale of the Membership units were not "cash funds" owned by Tiger.

- 11 -

question the trial court answered and from which North Sky appealed. Whether the Operating Agreement is silent as to how to distribute the proceeds since North Sky is not entitled to preferential treatment does not affect whether the trial court properly answered the question about the applicability of Sections 9.2 and 10.2.

In any event, Section 9.3 of the Operating Agreement enabled North Sky and any other holders of Series B units to convert their Series B units into Common units, which would increase their proportional equity interests from thirty-five percent to approximately forty-eight percent. (**See** Operating Agreement, at 43-51 § 9.3); (**see also** MEECO, Riddle and Bergson's Brief, at 22). North Sky did not exercise its conversion preference before the Cosa transaction. However, despite this, MEECO admitted in its Complaint that North Sky is entitled to it for purposes of the distribution of the proceeds from the Cosa transaction. (**See** Complaint, at 5 ¶ 26, 7 ¶ 28). Therefore, based on the language of Section 9.3 and MEECO's admission that North Star is entitled to the conversion preference contained therein for the distribution of the Cosa transaction proceeds, North Star's claim that the Operating Agreement fails to identify how proceeds are to be distributed should they not be entitled to a preference pursuant to Section 10.2 is disingenuous.

Finally, the cases on which North Sky relies in support of its argument that the trial court was precluded from granting judgment on the pleadings in MEECO's favor on its declaratory judgment claim because extrinsic evidence

would show that the pertinent provisions of the Operating Agreement are ambiguous and distinguishable. For instance, North Sky relies on ***Rourke v. Pa. Nat'l. Mut. Cas. Ins. Co.***, 116 A.3d 87 (Pa. Super. 2015), *appeal denied*, 128 A.3d 221 (Pa. 2015), and claims that this Court reversed a grant of judgment on the pleadings because the relevant insurance policy was ambiguous. (***See*** North Sky's Brief, at 36-37). However, in ***Rourke***, we reversed the trial court's grant of judgment on the pleadings, not because the subject policy's language was ambiguous, but because the trial court's interpretation of its meaning was erroneous.[7] ***See Rourke***, ***supra*** at 95-96.[8]

---

[7] The policy defined "covered family member" as "a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child." The policy did not define "ward." ***Rourke***, ***supra*** at 91 (record citation omitted). We concluded that the trial court's interpretation that a "ward" had to be a minor to be a "covered family member" was erroneous. ***See id.*** at 95-96.

[8] The remainder of the cases on which North Sky relies for this argument are similarly distinguishable and are not legally persuasive in this matter. ***See Insurance Adjustment Bureau, Inc. v. Allstate Ins. Co.***, 905 A.2d 462, 469-70 (Pa. 2006) (holding that trial court's grant of preliminary objections in the form of demurrer was error when subject insurance contract provision underlying cause of action was capable of two reasonable interpretations and, thus, was ambiguous); ***Nederostek v. Endicott-Johnson Shoe Co.***, 202 A.2d 72, 73 (Pa. 1964) (reversing grant of motion for judgment on the pleadings where trial court indicated that complaint's "basic allegation was susceptible of many interpretations."); ***In re Estate of Plasterer***, 198 A.2d 525, 527 (Pa. 1964) (reversing grant of preliminary objections where parties' intent was unclear because pertinent document contained "numerous misspellings, incomplete sentences, lack of punctuation, and generally horrendous grammar."); ***Mowry v. McWherter***, 100 A.2d 51, 54 (Pa. 1953) (noting that it had previously reversed court's grant of preliminary objections where relevant language of agreement was ambiguous); ***Bogojavlensky v.***

- 13 -

Here, the trial court properly decided the only issue before it and properly declared that the unambiguous language of the Operating Agreement made North Sky ineligible for preferred status in the distribution of the proceeds of the sale of the Membership units. Even if the Operating Agreement were silent as to how the Cosa proceeds are to be distributed, it does not render judgment on the pleadings as to the discrete issue before the trial court improper.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Prothonotary

Date: 10/3/19

---

***Logan***, 124 A.2d 412, 416 (Pa. Super. 1956) (reversing order granting judgment on the pleadings where breach of contract action alleged defendant's failure to pay, but answer raised factual issues and it was unclear whether time was of the essence in land sale and construction contract, thus going to central issue of complaint).