IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| GAMESA ENERGY USA, LLC AND GAMESA TECHNOLOGY CORPORATION INC., | : | No. 28 EAP 2018 |
| | : | |
| | : | Appeal from the Judgment of Superior |
| | : | Court entered on March 19, 2018 at |
| Appellants | : | No. 1635 EDA 2016 affirming in part |
| | : | and reversing in part the Order |
| | : | entered on May 20, 2016 in the Court |
| v. | : | of Common Pleas, Philadelphia |
| | : | County, Civil Division at No. 03768 |
| | : | March Term, 2013. |
| TEN PENN CENTER ASSOCIATES, L.P. | : | |
| AND SAP V TEN PENN CENTER NF G.P. | : | ARGUED:  March 5, 2019 |
| L.L.C., | : | |
| | : | |
| Appellees | : | |

## OPINION

**JUSTICE DOUGHERTY**                    **DECIDED:  September 26, 2019**

We granted discretionary review of this commercial landlord and tenant dispute to determine whether the Superior Court erred in holding the tenant was limited to damages for breach of contract and could not also recover the rent it paid following the landlord's breach, despite prevailing on its claims for both remedies at trial.  After careful review, for the reasons that follow, we affirm.

### I. Background

In 2008, Appellants, Gamesa Energy USA, LLC and Gamesa Technology Corporation, Inc. (Gamesa), entered into a commercial lease agreement (the Lease) to rent 35,000 square feet of office space in Philadelphia (the Premises) from Appellees,

Ten Penn Center Associates, L.P. and SAP V Ten Penn Center NF G.P. L.L.C. (collectively Ten Penn Center). The base terms of the Lease provided for a ten-year term ending September 2018, with annual rent escalating from $1,113,805 in year one to $1,144,470 in year ten, and a "tenant improvement allowance," or per-square-foot credit, for Gamesa to build out the office space to its specifications.[1]

Additional relevant provisions of the Lease are its terms setting forth criteria for subleasing and default. The Lease permitted Gamesa to sublease the premises, as long as Ten Penn Center approved of the arrangement. Specifically, the Lease provided, in pertinent part:

> Tenant shall not . . . sublet all or any part of the Premises or permit the same to be occupied or used by anyone other than Tenant or its employees without Landlord's prior written approval, **which approval shall not be unreasonably withheld, conditioned or delayed**. . . .

Lease, Art. 20.1 (emphasis added). The Lease required Gamesa to submit its sublease requests to Ten Penn Center in writing, including the following components: the proposed sub-lessee's name and address, a description of its business, its "most recent financial statement and other evidence of its financial responsibility," its intended use of the premises, and the terms and conditions of the proposed sublease. *Id.* at Art. 20.2. Upon receipt of such a request, the Lease required Ten Penn Center to grant or refuse its consent to the proposed sublease within thirty days. *Id.* With regard to default, the Lease provided, in relevant part, "[i]t shall be an '**Event of Default**' under this Lease if . . . Tenant

---

[1] The Lease initially provided an annual rent schedule of $1,113,805 in year one, then $1,011,589 in year two, escalating to $1,232,235 in year ten, and a tenant improvement allowance crediting Gamesa with $58.76 per square foot to improve the leased office space. *See* Lease, dated January 23, 2008, at 2-4. In 2009, the parties made minor amendments to the Lease, which incorporated the Lease, gave full effect to a majority of the Lease terms, and included a reduction of the annual minimum rent schedule to $939,332 in year two escalating to $1,144,470 in year ten, and the credit to $45 per square foot. *See* First Amended Lease, dated January 1, 2009, at 2.

vacates the Premises or attempts to remove or manifests an intention to remove any or all of Tenant's property from the Premises otherwise than in the ordinary and usual course of business . . . ." *Id.* at Art. 22 (emphasis in original). In the event of a default by Gamesa, the Lease entitled Ten Penn Center to terminate the lease, repossess the premises, accelerate the amount of rent owed for the remainder of the ten-year lease term, charge interest on overdue rent, and recover related attorney's fees. *Id.* at Art. 23.

In May 2011, following Gamesa's submission of the information required under Article 20.2 of the Lease, Ten Penn Center approved a request to sublease approximately 15,000 square feet, or forty percent of the Premises, to Viridity Energy, Inc. (Viridity) through August of 2018. N.T. 10/14/15, at 66-69. Ten Penn Center allowed Gamesa to use a portion of its improvement allowance to outfit the space for Viridity, after which point Gamesa's remaining credit balance was approximately $391,000. *Id.* at 73.

In April 2012, Gamesa informed Ten Penn Center it would be moving out of the Premises as part of a corporate consolidation, and would continue to pay its monthly rent and attempt to find a sub-lessee for the open space. *Id.* at 92-93. Gamesa vacated the Premises on May 18, 2012. *Id.* at 94-95. Viridity remained in the Premises under the terms of its sublease with Gamesa. Though Gamesa submitted its June 2012 rent payment eighteen days late, and its July rent two days late, the parties agree Gamesa continued to make all of its rent payments on time thereafter. *Id.* at 118, 139.

On June 12, 2012, Gamesa submitted a request to Ten Penn Center for consent to sublease 5,200 square feet of the Premises to Business Services International, LLC (BSI), a business entity comprised of two foreign corporations formed for the particular purpose of subleasing office space through Gamesa. *Id.* at 89-90; Trial Court Findings of Fact and Conclusions of Law, dated February 23, 2016, at 4 ¶13. The proposed BSI sublease anticipated rental payments totaling $265,460 over a three-year term. N.T.

10/15/15, at 17-18. Ten Penn Center responded on June 26th, informing Gamesa it was in default of the Lease for vacating the Premises and, as a result, Ten Penn Center had no obligation to entertain the request to sublease. N.T. 10/14/15, at 102-104; Letter dated June 26, 2012, Trial Court Exhibit P-9. Ten Penn Center also noted Gamesa's late rent payment for June. *Id.* Nevertheless, Ten Penn Center provided comments and questions about the proposed BSI sublease, and requested BSI's financials, which had not been included with the initial request. *Id*; *see* Email and Attachments dated June 12, 2012, Trial Court Exhibit P-7. Via letter dated July 5th, Gamesa objected to the assertion a default had occurred, but provided Ten Penn Center with the requested information. Email dated July 5, 2012, Trial Court Exhibit P-13. On July 13th, Ten Penn Center reiterated its position asserting Gamesa was in default for vacating the Premises; however, Ten Penn Center proposed it would grant consent to the BSI sublease if Gamesa forfeited its remaining tenant improvement allowance. N.T. 10/14/15, at 124-25, 140-41. Thereafter, negotiations between the parties stalled, and the proposed sublease with BSI never materialized.

On March 23, 2013, Gamesa filed a complaint against Ten Penn Center, asserting claims of breach of contract, tortious interference in business relationships, and unjust enrichment. Complaint at 9-14. Gamesa alleged Ten Penn Center materially breached the Lease by declaring Gamesa in default without basis; failing to accept or reject the sublease proposal within thirty days as required by the Lease; and unreasonably withholding or conditioning its consent to the sublease. Gamesa sought a declaration the Lease had been terminated as of the date Ten Penn Center declared Gamesa in default, and damages reflecting, *inter alia*, lost revenue associated with the proposed BSI sublease and return of all rent payments Gamesa made to Ten Penn Center since July 2012. In 2015, prior to trial, Ten Penn Center provided Gamesa with the remainder of its

tenant improvement allowance, and Gamesa improved the unfinished portion of the Premises. N.T. 10/14/15, at 154, 178. Until and through the trial, Gamesa continued to pay its rent, accept sub-rent from Viridity, and attempt to recruit potential sub-lessees, including hiring brokers, developing marketing materials, and coordinating building access for prospective sub-lessees. *Id.* at 176-80.

Following a non-jury trial, the trial court entered a verdict in favor of Gamesa, determining Ten Penn Center had breached the Lease in three specific ways: first, by advising Gamesa it was in default; second, by failing to approve or reject the proposed BSI sublease within thirty days of receipt of the request; and third, by unreasonably withholding, conditioning, or delaying its approval. Trial Court Findings of Fact and Conclusions of Law dated February 23, 2016, at 6, ¶¶24-25. The court noted Ten Penn Center did not declare a default of the Lease in April 2012 when it learned Gamesa would move out of the Premises, nor when it actually moved out on May 18, 2012, but declared the default only after receiving Gamesa's request for the BSI sublease, on June 26, 2012. *Id.* at ¶¶10-12, 22. The court found Gamesa had submitted a good faith and reasonable sublease application for BSI, noting the foreign corporations comprising BSI had a history of working in the United States and working together as well as with Gamesa, and provided references from the Governor's Office of International Business Development in support of their business development activities within the state. *Id.* at 4-5, ¶¶14-17, 20-21. The court further found Ten Penn Center's continuing claim Gamesa was in default resulted in Gamesa's reasonable belief it could not acquire a new subtenant while the validity of its own lease was unresolved. *Id.* at 6, ¶24.

With specific regard to Ten Penn Center's declaration of default and its purported failure to accept or reject the sublease application within thirty days, the trial court

concluded these defaults by Ten Penn Center constituted a material breach, as they prevented Gamesa from obtaining any additional subtenant, while Ten Penn Center continued to collect rent from Gamesa. *Id.* at 8, ¶3. In reaching this result, the court first determined Gamesa did not default on the Lease as it "did not have the requisite intent to abandon the Premises," and continued to pay rent and occupy the Premises through its subtenant Virdity. *Id.* at 7-8, ¶2. In addition, the court concluded Ten Penn Center's conduct — specifically, its delay of subtenant approval, its attempt to renegotiate the tenant improvement allowance, its operating under a self-declared default without demanding immediate repossession of the Premises, and its continued collection of the full rent — did not conform to standards of good faith and fair dealing, and thus was relevant to determining the materiality of the breach. *Id.* at 8-9, ¶3, *citing* Restatement (Second) of Contracts §241(e) ("In determining whether a failure to render or to offer performance is material, the following circumstances are significant . . . (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."). As a result, the court determined Ten Penn Center's breach was material and sufficient to terminate the Lease retroactively to July 22, 2012, the date when, by the trial court's calculation, Ten Penn Center failed to reject or approve the proposed BSI sublease after it had also wrongfully declared Gamesa in default.[2] *Id.* at 9, ¶4. For breach of contract, the court awarded Gamesa damages equal to the amount it would have received under the proposed three-year BSI sublease

---

[2] Despite ruling Gamesa's Lease with Ten Penn Center was terminated on July 22, 2012, the trial court left Gamesa's sublease with Virdity intact, directing full payment of rent be made to Ten Penn Center for Viridity's portion of the Premises. *See* Trial Court Findings of Fact and Conclusions of Law dated February 23, 2016, at 9 ¶4.

(totaling $265,463 plus pre-judgment interest). The court also concluded Ten Penn Center was unjustly enriched in the amount of rent paid by Gamesa to Ten Penn Center from the July 22, 2012 Lease termination until the conclusion of trial, and awarded Gamesa additional damages of $3,639,202.87, *i.e.*, the reimbursement of rents paid from July 22, 2012 through the end of trial. *See id.* at 9-10, ¶¶5-6.

Both parties filed post-trial motions. Gamesa requested the court mold the verdict to include pre- and post- judgment interest, which the trial court granted. Ten Penn Center requested to supplement the trial record with evidence Gamesa had subleased space in the building after trial, and requested the court vacate judgment against it, but the trial court denied both requests. Ten Penn Center filed a praecipe to enter judgment on the entire verdict amount including damages for breach of contract and termination; judgment was entered, and Ten Penn Center timely appealed to the Superior Court.

In its published opinion, a three-judge panel of the Superior Court affirmed the trial court's award of damages to Gamesa based on breach of contract by Ten Penn Center, *i.e.*, the value of the BSI sublease, but reversed the retroactive termination of the Lease and resultant award of rents paid after July 22, 2012 based on unjust enrichment. *See Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.* 181 A.3d 1188 (Pa. Super. 2018).

Reviewing the express language of the Lease, which provided, "[i]t shall be an '**Event of Default**' under this Lease if . . . (ii) [Gamesa] vacates the Premises[,]" the panel first determined the trial court erred in concluding Gamesa had not defaulted by vacating the Premises. *Id.* at 1192-1193, *quoting* Lease at Art. 22 (emphasis in original). Because the Lease clearly specified Gamesa would be in default if it **vacated** the premises, and

Gamesa undisputedly moved out on May 18, 2012, the panel determined Gamesa did vacate the premises and thus did default on the Lease; however, since Ten Penn Center chose not to terminate the Lease, as allowed under its terms, and did not seek any damages as a result of Gamesa's default, the panel further determined — and Ten Penn Center acknowledged at trial — Ten Penn Center waived any legal remedies it had due to breach of contract by Gamesa. *Id.*

Next, the Superior Court panel reviewed the trial court's finding Ten Penn Center breached its duties under Articles 20.1 and 20.2 of the Lease. *Id.* at 1193. The panel considered the Lease's proviso that Gamesa was not permitted to sublet portions of the Premises to another party "without [Ten Penn Center's] prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed." *Id., quoting* Lease at Art. 20.1. The panel further observed that, upon Gamesa's written request including the proposed sub-lessee's "most recent financial statement and other evidence of financial responsibility," Ten Penn Center was required to approve or deny the request within thirty days. *Id.*, *quoting* Lease at Art. 20.2.

The panel determined the trial court's finding Ten Penn Center unreasonably and impermissibly delayed its consent was factually and legally erroneous. *Id.* On its review of the record, the panel noted Gamesa, despite making its first request for approval of the BSI sublease on June 12, 2012, did not provide BSI's most recent financial statement to Ten Penn Center until July 5, 2012; thus, under the thirty-day deadline provision in Article 20.2 of the Lease, Ten Penn Center's approval or denial was required by August 4, 2012

and not, as the trial court calculated, July 22, 2012.[3] *Id.* The panel reasoned Ten Penn Center's response on July 13th, proposing Gamesa forfeit its remaining tenant improvement allowance in exchange for approval of the BSI sublease, was a counter-offer — and therefore a rejection — of the original offer which placed a new offer on the table for Gamesa to consider. *Id.*, *citing Yarnall v. Almy*, 703 A.2d 535, 539 (Pa. Super. 1997) ("[A] reply which . . . changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer.") (citations omitted). Concluding Ten Penn Center rejected the proposed BSI sublease within thirty days, the Superior Court panel rejected the trial court's ruling Ten Penn Center failed to timely accept or reject the sublease. *Id.*

However, regarding Ten Penn Center's conditioning of its approval of the sublease on forfeiture of Gamesa's tenant improvement credit, the Superior Court panel affirmed the trial court's conclusion the condition was unreasonable. The panel explained the record reflected a credibility determination by the trial court, which rejected Ten Penn Center's claim it reasonably conditioned sublease approval upon Gamesa's default and BSI's poor financials, and specifically found Gamesa's request was made in good faith. The panel declined to disturb this credibility determination, noting an appellate court lacks authority to do so. *Id.* at 1192, 1194, *quoting Ruthrauff, Inc. v. Ravin, Inc.,* 914 A.2d 880, 888 (Pa. Super. 2006) ("Issues of credibility and conflicts in evidence are for the trial court

---

[3] As the Superior Court panel noted, the trial court's calculations and its resulting orders appear also to include a scrivener's error. *See Gamesa*, 187 A.3d at 1193, n.2. Gamesa's first request to Ten Penn Center for approval of its BSI sublease was made on June 12, 2012. Assuming as the trial court did, though erroneously, the sublease application was complete as of June 12, the 30-day time period for approval would have been July 12, 2012, not July 22, 2012.

to resolve; [the Superior Court] is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder.") (citations omitted). Thus the panel discerned no error in the trial court's finding Ten Penn Center unreasonably withheld or conditioned its consent to sublease, thereby breaching one of its duties under the Lease. *Id.* at 1194. The Superior Court therefore affirmed the award to Gamesa of damages for breach of contract, *i.e.,* the loss of the BSI sublease.

Turning to the question of whether the trial court properly considered the Lease was terminated by Ten Penn Center's breach, such that Gamesa should be entitled to reimbursement of rent paid after that termination, the panel determined the trial court erred. The panel reasoned Gamesa had "elected its remedy" of damages for breach of contract, instead of reimbursement of rents paid after termination, by continuing to perform and benefit under the Lease after the date of breach, *i.e.*, Gamesa made all of its rent payments, continued to collect rent from Viridity and seek other subtenants, and used its remaining tenant improvement credit to build out the office space. *Id.* at 1194-95. Therefore, the panel reasoned, Gamesa could not achieve a double recovery through reimbursement of rent paid after Ten Penn Center breached the Lease in addition to damages for the breach. *Id.* at 1195, *quoting Wedgewood Diner, Inc. v. Good*, 534 A.2d 537, 538 (Pa. Super. 1987) (doctrine of election of remedies denotes "the act of choosing between two or more different and coexisting modes of procedure and relief allowed by the law on the same state of facts[;]" a party's unequivocal choice of "one of two or more inconsistent remedial rights" precludes any benefit from the other remedies) *and McCausland v. Wagner*, 78 A.3d 1093, 1102 (Pa. Super. 2013) ("[i]n a breach of contract suit, the plaintiff **either** may rescind the contract and seek restitution **or** enforce the

contract and recover damages based on expectation. . . . [T]he inconsistent nature of those actions is obvious — one cannot attempt to terminate his contractual obligations and, at the same time, seek to enforce the contract and enjoy its full benefits in an action for breach.") (citations omitted, emphasis in original).

Accordingly, while the panel affirmed the trial court's award of damages to Gamesa for breach of contract arising from its inability to sublease to BSI, the panel reversed the trial court's decision retroactively terminating the Lease and awarding damages based on rent payments made after Ten Penn Center's breach.[4]

Both parties sought allowance of appeal and we granted discretionary review of the following questions as stated by Gamesa:

a. May a litigant simultaneously pursue inconsistent, alternative remedies in a civil action in Pennsylvania prior to the entry of final judgment?

b. When one party to a contract breaches, should the non-breaching party be permitted to continue performance, if reasonable under the circumstances, and to maintain, in the alternative, causes of action for termination of the agreement if material, or if not material, for damages from the breach?

*Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 191 A.3d 749 (Pa. 2018).[5] The questions presented are issues of law, our standard of review is *de novo*, and our scope of review is plenary. *Schwartz v. Rockey*, 932 A.2d 885, 891 (Pa. 2007). Notwithstanding the precise terms of the two questions accepted for review, the parties focus their arguments on the doctrine of election of remedies, and its interpretation and

---

[4] The Superior Court also resolved issues raised by Ten Penn Center regarding the trial court's computation of damages and admission of certain evidence, which are not relevant to this appeal. *See Gamesa* 181 A.3d at 1194.

[5] In the same *per curiam* order, we denied Ten Penn Center's Cross Petition for Allowance of Appeal challenging that portion of the Superior Court's decision affirming damages for breach of contract. *Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 191 A.3d 749 (Pa. 2018).

application to the present factual scenario. "The primary substantive application of the doctrine has been to prevent double recovery for a single injury . . . and thus, an election should be required among inconsistent remedies at some point prior to the entry of a final judgment." *Id.* at 892 *citing* 25 Am.Jur.2d Election of Remedies §3 (2007) ("The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, or to alternative remedies, but to prevent double recoveries or redress for a single wrong."). *See also* Black's Law Dictionary (11th ed. 2019) (defining "election of remedies" as "a claimant's act of choosing between two or more concurrent but inconsistent remedies based on a single set of facts," and stating, "a claimant cannot simultaneously recover damages based on two different liability findings if the injury is the same for both claims, thus creating a double recovery.").

Gamesa first argues the Superior Court's determination Gamesa was bound by its continued performance of its Lease obligations to seek damages for breach of contract only — rather than the concurrent remedy of Lease termination and return of rent payments — created a rule which operates to preclude litigants from pursuing inconsistent alternative remedies in a civil action. Gamesa contends this rule is unduly strict, forcing all of the risk upon a non-breaching party who must guess whether the factfinder will determine if a breach is material. Gamesa notes a plaintiff who makes an early "election of remedies" is bound to pursue that chosen remedy to the exclusion of all other inconsistent remedies and, though legitimately aggrieved, risks recovering nothing by selecting the wrong theory to advance in litigation. *See* Appellant's Brief at 29-30, *citing Umbelina v. Adams*, 34 A.3d 151 (Pa. Super. 2011) (where plaintiff made pre-trial election to pursue rescission of contract for construction of home but did not prove material

breach, trial court erred by awarding damages for plaintiff's abandoned breach of warranty claim despite defective workmanship). Observing the primary objective of the election of remedies doctrine is to prevent double recovery, not to prevent a party from pursuing alternative claims, Gamesa submits a plaintiff should not be required to elect its remedy until after the verdict, *i.e.*, after a factfinder has determined if a breach is material, but prior to the entry of judgment. Gamesa relies on *Schwartz*, 932 A.2d 885, which explained, "an early election may operate to the prejudice of an innocent party, given the inability to predict the course of the litigation relative to any particular claim for relief[,]" and "an election should be required among inconsistent remedies at some point prior to the entry of a final judgment." *See* Appellant's Brief at 31, 36, *quoting Schwartz*, 932 A.2d at 892-93. Gamesa argues it did not seek double recovery from the trial court, but instead brought alternative claims for either termination of the Lease or damages for partial breach, and was thwarted from electing its remedy prior to judgment as a result of Ten Penn Center's filing of a praecipe for judgment.

Alternatively, Gamesa argues the appropriate standard for assessing the significance of non-breaching parties' post-breach conduct is whether their continued performance was commercially reasonable; if it was, then continued performance does not waive a cause of action for material breach, and the non-breaching party may maintain causes of action for both material and non-material breach. Analogizing commercial leases to the sale of goods as governed by the Uniform Commercial Code ("UCC"), and noting both types of transactions share similarities by virtue of their long-term contractual relationships, Gamesa argues that in certain situations where a purchaser has breached a contract, the UCC allows a seller of goods the option of completing its performance

under the contract "in the exercise of reasonable commercial judgment," and then seeking damages for its complete performance. *See Id.* at 40-41, *citing* Official Comment 1 to UCC §2-703 (Article 2 of the UCC "rejects any doctrine of election of remedy as a fundamental policy and thus the remedies are essentially cumulative in nature and include all of the available remedies for breach. Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case.") *and* Official Comment 2 to UCC §2-704. Gamesa also relies on *Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1972), which invoked UCC Sections 2-703 and 2-704 to determine a gas plant's continued delivery of helium to the federal government, after the government breached the parties' contract by failing to pay, could be commercially reasonable under the circumstances, and therefore the plant's post-breach performance did not bar its claim for material breach at the summary judgment stage.

Gamesa thereby argues the Superior Court failed to consider the reasonableness of its continuing to pay rent in light of its duty to its sub-lessee, as well as Ten Penn Center's purported bad faith, and the consequences Gamesa would face for abandoning the Lease, including: liability for material breach and attorneys' fees if the court did not agree Ten Penn Center materially breached; acceleration of the full amount of approximately $5 million in rent due for the entire Lease term; and liability to Viridity in the event of eviction by Ten Penn Center. Gamesa thus contends it had no choice but to continue performing under the Lease, and the Superior Court's holding now precludes innocent, non-breaching parties from pursuing a valid claim for material breach if they have performed in any reasonable way after the other party's breach, and forces innocent parties to take an immediate position regarding a breach prior to gathering all necessary

facts through the discovery process and notwithstanding the complexity of the relationship and amount of money at issue.

Conversely, Ten Penn Center observes a distinction between a "procedural" election of remedies pertaining to what kind of damages can be simultaneously recovered, and the contractual, "substantive" election of remedies through which a party's continued performance of contract obligations waives its right to restitution for a material breach by the other party. *See* Appellees' Brief at 39-44*, citing, e.g.*, 25 Am. Jur. 2d Election of Remedies §2 (2014) ("[T]he doctrine . . . is not a rule of substantive law but one of procedure or judicial administration"); *but cf., e.g.*, 17A Am. Jur. 2d Contracts §710, (2019) (Regarding an election to treat a breach as total or partial, "[a] party waives the right to restitution for total breach when it accepts or receives partial performance."). Ten Penn Center submits litigants are permitted to plead and pursue inconsistent remedies, as Gamesa did at trial, but the Superior Court correctly rejected the trial court's "retroactive-termination-and-give-back-the-rent remedy" based on Gamesa's continued performance that rendered termination of the Lease and reimbursement of rents an improper remedy. *Id.* at 40-41.

Specifically, and consistent with the Superior Court's reasoning, Ten Penn Center argues settled principles of contract law definitively determine that Gamesa's continued payment of rent to Ten Penn Center, as well as its continued possession of the Premises, acceptance of rent from its sub-lessee, and exhaustion of its tenant improvement credit to build out the space, affirmed the Lease and surrendered any right it might have had to terminate the Lease. *See id.* at 21-29, 54, *citing, e.g., Gillard v. Martin*, 13 A.3d 482, 487 (Pa. Super. Ct. 2010) (*quoting* 13 Williston on Contracts §39:32, 4th ed., "When one party

commits a material breach of contract, the other party has a choice between two inconsistent rights — it can either elect to allege a total breach, terminate the contract and bring an action or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach — but the nonbreaching party, by electing to continue receiving benefits [under] the agreement, cannot then refuse to perform [its] part of the bargain."). In reliance on these principles, Ten Penn Center acknowledges its own expressed remedy under the Lease for Gamesa's default-by-vacating was to terminate the Lease and repossess the Premises — in other words, to declare a material breach and rescind the contract. Ten Penn Center claims that by not doing so, it elected to continue performing its own obligations under the contract, and conclusively elected against, or waived, any claim for termination as a result of Gamesa vacating the premises. *Id.* at 54-55. Likewise, Ten Penn Center argues, Gamesa elected to continue paying rent and benefitting from the Lease following Ten Penn Center's breach, and therefore also conclusively elected against terminating the Lease and seeking damages for its rescission. *Id.*

Ten Penn Center further submits termination or rescission of the contract is a viable remedy only when both parties can be restored to their original positions, and once a party receives a benefit under a contract, rescission is barred. *Id.* at 33-34, *quoting Harold ex rel. Harold v. McCann,* 406 F. Supp. 2d 562, 575 (E.D. Pa. 2005) (*quoting Doppler v. Doppler,* 574 A.2d 1101, 1106 (Pa. Super. Ct. 1990)) ("It is axiomatic that 'a rescission can only be granted where the parties to a contract can be restored to their original positions with regard to the subject matter of the contract.'") *and Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C.,* 929 F. Supp. 2d 460, 472 (W.D. Pa.

2013) ("The injured party's retention of any benefit received under the contractual undertaking bars rescission.") (additional citations omitted). Ten Penn Center notes the trial court's award based upon purported termination or rescission of the Lease actually deprived it of nearly four years' rent for a period of time when Gamesa had legal possession of the Premises, while Gamesa received the windfall double recovery of both contract damages (for the loss of the BSI sublease) and four years of rent-free tenancy. *Id.* at 35-36.

Ten Penn Center distinguishes the circumstances of *Northern Helex* from its relationship with Gamesa, as the UCC principles relied on therein provide a remedy to a seller of goods, a wholly different creature from the lessee in a commercial lease contract. *Id.* at 44-45. Ten Penn Center notes a seller of goods may exercise commercial reasonableness in opting to continue its performance of the contract despite a breach by the buyer only to the extent the seller cannot otherwise resell the goods. *Id.* at 45. Moreover, the factual circumstances of *Northern Helex* are not analogous: there, it was physically impossible for the non-breaching chemical plant seller to cease production of helium, a byproduct of its other operations, and it did not have the capacity to store it; thus, under those unique circumstances, the plant had no option but to continue delivering the product even after the buyer failed to pay for it. *Id.* at 48-49. Contrarily, Ten Penn Center observes, in the instant case there were no special facts justifying a material breach claim in spite of continued performance by Gamesa, and it was merely risky, not impossible, for Gamesa to declare a material breach and insist on termination of the Lease. Essentially, Ten Penn Center contends the risk Gamesa faced by deciding to terminate the Lease before knowing whether a breach by Ten Penn Center would be

legally considered "material" is a risk it should have anticipated in accordance with contract law principles. *Id.* at 37-38, *citing, e.g., Surgical Laser Techs., Inc. v. Heraeus Laseronics, Inc.,* 1995 WL 70535, at *4 (E.D. Pa. Feb. 15, 1995) (plaintiff's claimed vulnerability to countersuit for breach if it terminated agreement and court later found defendant's breach immaterial did not override established election-of-remedies rule, but "simply reflect[ed] the risks imposed by Pennsylvania law on the non-breaching party to a contract."). Ten Penn Center thus seeks affirmance of the Superior Court's decision.[6]

## II. Discussion

Preliminarily, we note "a lease is in the nature of a contract and is to be controlled by principles of contract law." *Pugh v. Holmes*, 405 A.2d 897, 903 (Pa. 1979). Furthermore, we recognize "parties have the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used." *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984) (internal formatting omitted). We further recognize the following lower court determinations — which are not challenged in this appeal and thus are settled matters for purposes of this case — provide context for our analysis of the issues at hand: Gamesa first defaulted on the Lease by vacating the Premises in May 2012 and therefore

---

[6] In support of Ten Penn Center, the Philadelphia Real Estate Council, a self-described real estate industry peer group, filed an *amicus curiae* brief, largely reiterating Ten Penn Center's arguments, but underscoring that reinstatement of the trial court's order would vitiate landlords' ability to cure performance defects for the sake of preserving leases. According to *amicus*, such a consequence significantly elevates the landlord's risk, and within the context of commercial leases, subjects landlords to the unpredictable prospect of being forced to provide multiple years of million-dollar tenancies, potentially rent-free. *Amicus* contends this result would have a deleterious effect on Pennsylvania's sizable commercial real estate market. *See Amicus* Brief at 15-19.

Ten Penn Center's declaration of Gamesa's default by letter dated June 26, 2012 was not itself a breach; however, despite continuing to raise the default as an excuse for its own contractual obligations, Ten Penn Center waived Gamesa's default by not pursuing damages or termination of the Lease; Ten Penn Center responded timely to the BSI sublease request, and did not breach the Lease in that respect; Ten Penn Center did breach the Lease by unreasonably conditioning its approval of the BSI sublease on Gamesa's forfeiture of its tenant improvement credit; and, Gamesa is entitled to damages for that breach in the amount of sublease rent it would have received from BSI.

As we have noted, the purpose of the doctrine of election of remedies is to prevent a windfall or double recovery for a single injury. *See Schwartz*, 932 A.2d at 892, *citing* 25 Am.Jur.2d Election of Remedies §3 (2007) ("The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, or to alternative remedies, but to prevent double recoveries or redress for a single wrong."). Moreover, we have observed there are both procedural and substantive applications of the doctrine. *Id.*

As a procedural issue, the election of remedies doctrine arises out of fairness to opposing parties, and relates to whether a party is prevented from pleading and pursuing inconsistent claims in a civil action. *Id.* at 892-94 (in absence of demonstrated detrimental reliance by opposing party, plaintiff may substitute claim with inconsistent remedy in amended pleading); *see also* 25 Am.Jur.2d Election of Remedies §3 (2007) (doctrine "is designed to mitigate possible unfairness to both parties [and] rests on the moral premise that it is fair to hold people responsible for their choices"). Our courts have consistently held once a party makes a "binding" election of one remedy over other inconsistent remedies, it is precluded from thereafter maintaining an action on those inconsistent

remedies; further, a "binding" election of remedies occurs when there has been a legal resolution, such as a settlement, a stipulation, a waiver, an expressed withdrawal or abandonment of claims, a judgment, or application of another exclusionary rule, and in such circumstances, the electing party may no longer pursue alternative forms of relief on a given claim. *See, e.g., Pittsburgh Union Stock Yards Co. v. Pittsburgh Joint Stock Yards Co.*, 163 A. 668, 669 (Pa. 1932) (party invoking contract's binding arbitration provision could not later seek court's merits review of unfavorable judgment; the election, once made, was irrevocable); *Wedgewood Diner*, 534 A.2d 537 (plaintiff recovering breach of contract damages against one defendant was barred from pursuing rescission of the same contract against a second defendant); *Umbelina*, 34 A.3d 151 (despite unsuccessful claim for rescission, plaintiff could not recover damages on breach of warranty claim where it made pretrial election to abandon breach claim and pursue only rescission), *appeal denied* 47 A.3d 848 (Pa. 2012); *McCausland v. Wagner*, 78 A.3d 1093 (Pa. Super. 2013) (plaintiff who pleaded claims seeking both contract damages and rescission was barred from pursuing rescission claim after accepting settlement for damages); *but see, e.g., Appeal of Kreiser,* 19 P.F. Smith 194 (Pa. 1871) (election not binding until all circumstances known).

In *Schwartz*, this Court determined a plaintiff's initially-pleaded claim for contract-based damages did not foreclose a subsequent, properly-pleaded substitution of that claim with one seeking the inconsistent remedy of contract rescission. In allowing the amendment, the Court reasoned, "an early election may operate to the prejudice of an innocent party, given the inability to predict the course of the litigation relative to any particular claim for relief[;]" further, a plaintiff's access to relevant information may only be

available via discovery, and plaintiff may otherwise inadvertently waive claims if it cannot access material facts. *Schwartz*, 932 A.2d at 893. Moreover, our Rules of Civil Procedure expressly allow the pleading of alternative causes of action, *see* Pa.R.C.P. 1020(c), and further permit liberal amendment of pleadings in order to secure a proper determination of the merits. *See Morrison Informatics, Inc. v. Members 1st Federal Credit Union*, 139 A.3d 1241, 1246 (Pa. 2016). Accordingly, a party may generally simultaneously plead and attempt to prove alternative causes of action seeking damages through inconsistent remedies supported by the same factual scenario. Gamesa, unencumbered by any **procedurally** binding election, was properly permitted to plead and pursue its alternative claims seeking the inconsistent remedies of damages for breach of contract and for termination/rescission of the Lease.

However, the substantive application of the election of remedies doctrine operates to bar windfall judgments or otherwise duplicative recoveries resulting from a single injury; although such inconsistent remedies may be pleaded and pursued in litigation, damages calculated pursuant to only one theory may be recovered. *Schwartz* 932 A.2d at 892-94; *Colonial Trust Co. v. Flanagan*, 25 A.2d 728, 730 (Pa. 1942) ("[T]he law will not allow [a party] to claim by two judgments in the same action, or to reverse his judgment and still claim by it; or to say I will hold by the one and take all I can get by the other."); *see, e.g., Wedgewood Diner*, 534 A.2d at 538, *quoting* 40 A.L.R.4th 627 at §2[a] ("The phrase [election of remedies denotes] the doctrine that the adoption, by an unequivocal act, of one of two or more inconsistent remedial rights has the effect of precluding a resort to the others."). Logically, as the particular facts and circumstances of a case, including the conduct of the parties, are relevant in determining which claims fail or succeed, they are

also relevant in determining which one of any inconsistent remedies is the appropriate award. To the extent a claimant's conduct may bar recovery of one or more remedies, the election of remedies doctrine is instructive: within the context of contract law, the victim of a material breach must elect either to rescind the contract and recover restitution of what has been paid, or, to continue the contract, treat the breach as partial, and seek recovery of its damages for the breach. *See* 25 Am. Jur. 2d Election of Remedies §25 *and* 17A Am. Jur. 2d Contracts §710; *accord Umbelina*, 34 A.3d at 157 (Pa. Super. 2011) (explaining claims for contract rescission and contract damages for breach of the same contract are essentially inconsistent remedies; "[o]ne may not terminate contractual obligations and seek the return of his consideration based upon the other party's promise through an action for rescission and restitution and at the same time seek the full benefits of that promise through an action for breach.").

Pursuant to these principles, it is clear a party waives, or, more aptly, elects **against**, the right to recover restitution for total breach when it accepts or receives partial performance, or continues to perform or benefit under the contract. *See* 17A Am. Jur. 2d Contracts §710; 13 Williston on Contracts §39:32 (4th ed.) ("[T]he nonbreaching party, by electing to continue receiving benefits under the agreement, cannot then refuse to perform its part of the bargain."); 13 Williston on Contracts §39:33 ("[E]ven an express reservation of rights or remedies is generally ineffective once the party put to an election following a breach of the contract makes its choice. One who continues to receive benefits under a contract and assert rights under it after learning of a breach that would justify a refusal to continue performance cannot subsequently urge this breach as an excuse for its own nonperformance, even though that party has consistently asserted the

excuse from the outset, unless the other party assents to the reservation of rights."); 14 Williston on Contracts § 43:15 (4th ed.) ("[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply when the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.").

Accordingly, where a non-breaching party opts to continue performing post-breach and receiving benefits as it would under the contract, the law presumes the non-breaching party has elected against a remedy of rescission, or retroactive termination, of the contract, and the non-breaching party cannot recover restitution damages as if the contract ceased to exist at the time of the breach. Additionally, because the objective of rescission is to return both parties as nearly as possible to their positions before they made the contract, a claim seeking a contract's termination "should be granted only where the parties to a contract can be placed in their former positions with regard to the subject matter of the contract." *Umbelina,* 34 A.3d at 157; *accord* 17B C.J.S. Contracts § 651 (2019) ("The restoration of the status quo of the parties is, as a general rule, necessary for the rescission of a contract. . . . Rescission is generally not available where the parties' condition as it existed prior to the agreement cannot be restored."); *see also* Restatement (Second) of Contracts §384 (party seeking restitution must be able to return benefit it received). A claim calling for a contract's rescission must also be pursued with sufficient promptitude, including prompt notification to the breaching party. *Schwartz*, 932 A.2d at 889-90, 895 (home buyers who lived in house for six years and did not promptly seek to rescind sales contract once they became aware of undisclosed water damage were not

entitled to rescind); *see also Fichera v. Gording*, 227 A.2d 642, 643–44 (Pa. 1967) ("When a party discovers facts which warrant rescission of his contract, it is his duty to act promptly, and in case he elects to rescind, to notify the other party without delay, or within a reasonable time. . . . [T]he rescission should be made while the parties can still be restored to their original positions. Failure to rescind within a reasonable time is evidence, and may be conclusive evidence, of an election to affirm the contract."), *quoting* 8 Pennsylvania Law Encyclopedia §258 at 280-81, with approval.

Here, the trial court awarded two kinds of damages to Gamesa, for the single injury of Ten Penn Center's breach by unreasonably conditioning its approval of the BSI sublease. First, it awarded damages for breach of contract in the amount of Gamesa's expected rent receipts from its thwarted sublease with BSI. Second, the trial court retroactively terminated the Lease between Gamesa and Ten Penn Center and awarded return of Gamesa's rent payments in the amount the court considered Ten Penn Center to be "unjustly enriched" after breaching the Lease. This award effectively allowed Gamesa to continue accruing benefits under the Lease **after** the Lease had been terminated, including sub-rents from both Viridity and, in essence, BSI. The damages awarded by the trial court were thus duplicative and inconsistent, based upon two separate theories of recovery for the same injury, and Gamesa may recover under only one. *See Schwartz*, 932 A.2d at 892; *Colonial Trust Co.,* 25 A.2d at 730. As a result of the unreasonable condition it placed on approval of the BSI sublease, Ten Penn Center breached the Lease with Gamesa; however, at no point did Gamesa attempt to treat the Lease as terminated, but continued to perform and receive benefits under the contract for over three years following Ten Penn Center's breach, during which time Ten Penn Center

was unable to use the Premises for any purpose other than its Lease with Gamesa. Obviously, Ten Penn Center cannot recover use of the Premises for the post-breach time period, and cannot be returned to its pre-breach position by retroactive termination of the Lease. Moreover, Gamesa, by continuing to pay rent to Ten Penn Center, and by continuing to benefit under the Lease — including not only by its receipt of sub-rents, but also by its continued right of possession of the Premises — thereby behaved as though the contract was still in effect, affirmed the contract, and conclusively elected to treat the breach as partial, thus barring any purported claim for rescission.

Yet, notwithstanding the foregoing analysis, Gamesa urges us to consider that an exception to the doctrinal principles exists when the non-breaching party's continued performance of the contract is a commercially reasonable course of conduct, and further, to determine Gamesa's particular circumstances place it within such an exception warranting termination of the Lease and return of its rent payments. Appellant's Brief at 38-48. We decline Gamesa's invitation to adopt such a standard because Gamesa's analogies to UCC Article 2 and *Northern Helex* are unavailing. As an initial point of clarification, UCC Article 2 governs the commercial purchase and sale of goods, and presently excludes commercial real estate leases from its scope. *See* UCC §§2-102, 2-105 (defining "goods" to mean "things . . . which are movable"). Furthermore, the UCC provision proffered by Gamesa specifically governs the unique circumstance where a buyer of goods breaches the sale contract prior to the completed manufacture of the goods; the subject contract of sale bears little similarity to the Lease between Gamesa

and Ten Penn Center, and Gamesa's attempt to apply the UCC principle here is not persuasive.[7] *See* UCC §2-704(2).

Likewise, *Northern Helex* is not binding precedent and is easily distinguishable from the instant matter. In *Northern Helex*, a chemical plant contracting with the federal government produced helium as a byproduct of its other operations; under a statutory helium conservation program, the government agreed to buy the helium, and the plant agreed to capture and deliver it to the government's facilities. *See Northern Helex*, 455 F.2d at 548. The government stopped making payments under the contract, but the plant continued to capture and deliver the helium. *Id.* at 549-50. The government moved for summary judgment seeking to dismiss the chemical plant's material breach claim seeking payment as waived due to its continued performance after the government's breach. *Id.* at 551. The court denied the government's motion, reasoning nonpayment was a definitively material breach, it was impossible to cease the helium production, the plant had no facility suitable to store it, and the plant's actions were consistent with the helium conservation program. *Id.* at 551-56.

To the extent it has persuasive value here, *Northern Helex* illustrates a case where the unique circumstances provoking a non-breaching party's post-breach continued

---

[7] Gamesa further suggests we adopt the "commercial reasonableness" standard described in UCC Section 2-704, which governs the special circumstance where a buyer of goods breaches the contract before the goods are finished. There, the seller may exercise its reasonable commercial judgment in deciding whether to complete the manufacture and seek payment under the contract, or to cease production and resell the salvage "or proceed in any other reasonable manner." UCC §2-704(2). Though we do not find Gamesa's analogy to the UCC persuasive, it bears noting, in electing whether to continue or cease performance of a contract under UCC §2-704, the "reasonable commercial judgment" anticipates mitigating, rather than accruing and increasing, the seller's damages. *See* Official Comment 2 to UCC §2-704.

performance of a contract were relevant to negate an election favoring remedies for partial breach, at least insofar as they presented a factual issue overcoming a motion for summary judgment. We do not foreclose the possibility that the circumstances surrounding post-breach performance by a non-breaching party might be relevant, and that they might, in rare instances, prove sufficient to withstand a conclusive election against a remedy for material breach. *See, e.g., Gillard*, 13 A.3d at 488-89 (employee did not waive claim for material breach despite continued performance where employee disclosed grievances and employer provided written assurance of better future performance) (*quoting* 13 Williston on Contracts §39:32, 4th ed. (1990), "[A]lthough a default unquestionably may be waived by continuing to perform or accepting performance despite a breach or failure of a condition, where the nondefaulting party brings its complaints to the defaulting party's attention, and continues the relationship only on the assurance of better future performance, he or she will not be barred from asserting her rights under the contract; in such a case, the successive acceptances of performance do not justify the belief that the performance of the character tendered was satisfactory, and a waiver of the right to the promised performance cannot be found."); *Northern Helex*, 455 F.2d at 553 ("[C]essation of production was commercially impossible and avoidance of waste most desirable.").

Yet, such circumstances contravene the rule and would necessarily be rare; as we noted in *Schwartz*, even a fraud would not warrant rescission where the non-breaching party has full knowledge of the bad behavior and chooses to continue performing the contract. *See Schwartz*, 932 A.2d at 893, *citing Browning v. Rodman*, 111 A. 877, 878 (Pa. 1920) ("[A]cts done in affirmation of the contract can amount to a waiver of the fraud

only where they are done with full knowledge of the fraud and of all material facts, and with the intention clearly manifested of abiding by the contract."). Moreover, unlike the circumstances in *Northern Helex*, Gamesa has not demonstrated it was impossible to cease performance — that is, to discontinue making rent payments to Ten Penn Center and receiving sub-rent payments from Viridity, and to relinquish its possession of the Premises — only that under the contract terms they bargained for and agreed to, it was very risky and highly disadvantageous for them to do so given the precarious position they occupied under the Lease upon moving out of the Premises, which, according to the Superior Court, sufficiently established the initial default of the parties' agreement. *See Gamesa*, 187 A.3d at 1193.

### III. Conclusion

Accordingly, we hold a non-breaching party to a contract may, by its conduct following a breach, conclusively elect its remedy and be bound by it to one theory for recovery of damages. The Superior Court correctly determined the trial court erred by retroactively terminating the lease agreement between the parties, and by awarding Gamesa damages for both breach of and rescission of the Lease.

Order affirmed.

Justices Baer, Todd, Donohue, Wecht and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion.